Filed 8/31/17

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B261606 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA053907) |
| v. | |
| CARLOS MIGUEL IRAHETA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge. Reversed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

---

**\*** Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2 and 3 of the Discussion.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

---

Defendant and appellant Carlos Miguel Iraheta was convicted of shooting at an occupied motor vehicle (Pen. Code, § 246)[1] with a section 12022.53, subdivision (d) firearm enhancement, and sentenced to 30 years to life in prison. Iraheta contends that in light of our Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), admission of gang expert testimony, as well as evidence related to "field identification" cards, was prejudicial error. We agree, and therefore reverse.

In the unpublished portion of the opinion, we reject Iraheta's arguments that addition of the section 246 charge after his successful appeal of his earlier conviction constituted vindictive prosecution and the section 246 conviction was barred by the statute of limitations.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *People's evidence*

(i) *The December 2002 shooting of Michael Orozco*

On December 20, 2002, at approximately 5:30 p.m., Noe Martinez drove his white Honda Civic to the Jr. Market in Inglewood. Inside the market, Jose Tovar, whom Martinez did

---

[1]    All further undesignated statutory references are to the Penal Code.

2

not know, stared at him, giving him a bad feeling. When Martinez left the market, Tovar walked toward Martinez's Honda. Tovar was a member of the Inglewood 13 criminal street gang.

Martinez then drove to the home of his friend, 17-year-old Michael Orozco, where the two socialized and drank beer and tequila. At approximately 8:30 that evening Orozco and Martinez headed for another friend's home. Because Martinez was feeling "buzzed," Orozco drove Martinez's Honda. Their route took them past the Jr. Market.

Meanwhile, Iraheta, his pregnant girlfriend Melody Maciel, his younger brother Richard Iraheta,[2] and his stepbrother Alexis Moreno planned to go to the movies. Iraheta drove the group in his Camaro. En route, they stopped at the Jr. Market, where Iraheta saw his friend Tovar. While they were talking, Martinez's car passed by the market, and Tovar pointed at it.

Martinez saw Tovar's gesture and told Orozco to "step on it." Iraheta followed them in his Camaro. Orozco drove to 65th Street and, at Martinez's direction, stopped the car. Martinez exited the Honda, intending to talk to the people in the Camaro. He was wearing a red hat and a dark red jacket or shirt. Iraheta, driving the Camaro, pulled up slowly. Martinez lifted his hands up and said, " 'what's going on?' " As the Camaro passed the Honda, Iraheta fired a single gunshot and sped off. The shot shattered the Honda's driver's side window and hit Orozco in the neck, fatally wounding him.

---

[2]     For ease of reference, and with no disrespect, we hereinafter sometimes refer to Richard Iraheta and Melody Maciel by their first names.

3

(ii) *The investigation*

Officers stopped the Camaro shortly after the shooting. An officer found a loaded gun under the front passenger seat. One round was expended. Forensic testing revealed that the bullet that killed Orozco had been fired from the gun. At a field showup conducted shortly after the shooting, Martinez identified the Camaro and Iraheta. Officers did not find a gun in Martinez's Honda.

(iii) *Statements and testimony by the other occupants of the Camaro*

Moreno and Melody testified that as the Honda passed the Jr. Market, it slowed and then sped off. En route to Melody's house, Iraheta's group came upon the Honda stopped in the middle of the road, partially blocking their path. Melody asked Orozco to move the car. Martinez approached the back of the Camaro. Both Melody and Moreno heard Richard say, " 'he's got a gun.' " Iraheta pulled a gun from under his seat, fired a single shot at the Honda, and drove off. A white SUV or truck with its high beams on briefly chased the Camaro. Melody asked Iraheta, " 'What were you thinking? Why did you do it?' " He replied that "he was sorry; that he didn't want to put us in this situation but he did it for our own safety." Iraheta handed the gun to Melody and told her to put it under her seat. In a recorded police interview, Moreno stated that Iraheta had followed the Honda after leaving the market. He explained at trial that he did not mean Iraheta intentionally followed the Honda, but that Iraheta simply travelled in the same direction.

(iv) *Gang evidence*

A gang expert testified regarding the characteristics and activities of the Inglewood 13 gang. He opined that Iraheta was

4

an Inglewood 13 gang member, based on his "West L.A." tattoo, attire, and association with other gang members. When given a hypothetical based on the facts of the case, the expert opined that the motive for the shooting was gang-related. Other officers testified to contacts with and preparation of field identification (FI) cards regarding Iraheta and other persons they believed to be gang members.[3]

  b. *Defense evidence*

Iraheta testified in his own defense. At the time of the shooting, he was 19 years old, had no criminal record, was in the military reserves, and was not a gang member. He and Melody were planning to marry. He had just been hired by Bank of America and was enrolled to start classes at ITT Tech. He had a "West L.A." tattoo, but it was not a gang tattoo. He had the gun for protection because he had been beaten up near his house by gang members approximately six months before the shooting. He had been walking home from a sandwich shop when gang members confronted him, and they attacked when he stated he was not a gang member.

On the night of the shooting, Iraheta, Melody, and his brothers were planning to go to the movies at Universal City Walk. He drove by the Jr. Market and his friend Tovar flagged him down. While he and Tovar were talking, Martinez's Honda passed by. Tovar warned Iraheta that the Honda's occupants had been "cruising around and looking for trouble" and had " 'mad-dogg[ed]' " him earlier that day. Iraheta left the Jr. Market a few minutes later. He did not intentionally follow the Honda, but his

---

[3]     We discuss this evidence, and Iraheta's responsive evidence, in more detail where relevant, *post*.

route took him to 65th Street. The Honda was stopped in the street, blocking it. Martinez was standing outside the car. Iraheta signaled to Martinez to move the car. Martinez then put his hands up as if to say " 'What's up?' " Eventually, Orozco moved the Honda enough that Iraheta attempted to squeeze by. Martinez approached the back of the Camaro. When the Camaro was approximately parallel to the Honda, Richard said, " 'keep going. He gots a gun' " or similar words. Iraheta saw Orozco looking at him and saying something. Orozco had a small pistol in his hand and was tapping it on the Honda's window. Iraheta grabbed his gun from under the seat and fired one round while simultaneously hitting the gas pedal. He believed Orozco was going to fire first. He was afraid Melody, who was carrying his baby, was going to be shot as she was closest to the Honda. When asked why he did not simply speed up and drive away, he explained: "My foot was halfway down on the [brake] pedal. And it just – it just happened quickly. I did speed off at the same time as I fired. And even if I would have hit the gas, [Martinez] was behind my car, and they would have just shot into my car, and Melody is right next to that other guy so the threat was there." On cross-examination, Iraheta admitted he had previously testified that he was unsure whether Orozco had a gun or a cellular telephone in his hand.

Tovar testified that he saw the Honda slow as it passed the Jr. Market. He believed one of the men in the Honda was a gang member because he was wearing red, a gang color. As he was talking to Iraheta, the Honda passed by again. Tovar told Iraheta to be careful because the men in the Honda " 'might be guys looking for trouble' " or "they don't look like they're from here." Tovar admitted he had been an Inglewood 13 gang

member from 1996 to 1999.  He admitted telling an officer in 2011 that he was an Inglewood 13 member, but he had not in fact been affiliated since 2000.  Iraheta was not a gang member.

Among other things, the defense introduced the testimony of two witnesses who had attended basic training with Iraheta, and did not know him to be a gang member; expert testimony regarding the "fight or flight" syndrome; expert testimony regarding the Culver City Boys gang, whose gang color was red; and a gun expert's testimony that an object shown in a photograph of the Honda's interior, but not discovered by police, was a gun.

2. *Procedure*

In 2003, after an earlier trial, a jury convicted Iraheta of second degree murder with a firearm enhancement.  We affirmed the judgment in an unpublished opinion.  (*People v. Iraheta* (Apr. 30, 2008, B173223 (*Iraheta I*).)  Thereafter our Supreme Court granted review and, after issuance of its opinion in *People v. Chun* (2009) 45 Cal.4th 1172, transferred the matter back to us for reconsideration in light of that decision.  Overruling prior precedent, *Chun* held that shooting at an occupied motor vehicle (§ 246) could not serve as the basis for a felony-murder instruction.  We concluded that the trial court's contrary instruction was prejudicial error under *Chun*, and reversed in an unpublished opinion.  (*People v. Iraheta* (Nov. 20, 2009, B173223) (*Iraheta II*).)[4]

_____

[4]    We take judicial notice of our unpublished opinions filed in this matter on April 30, 2008 and November 20, 2009, of our partially published opinion in *People v. Iraheta* (2014) 227 Cal.App.4th 611 (*Iraheta III*), and of the record in the 2013

The People then filed an amended information charging Iraheta with murder (§ 187, subd. (a)) and adding a second count of shooting at an occupied motor vehicle (§ 246), with section 12022.53 firearm allegations. Upon the retrial that is the subject of the instant appeal, the jury convicted Iraheta of shooting at an occupied motor vehicle in violation of section 246, and found the firearm allegations true. It deadlocked on the second degree murder charge, and the trial court declared a mistrial on that count.

Iraheta then filed a motion for a new trial on a variety of grounds. The trial court granted the new trial motion on the ground that it had erred in failing to instruct the jury on imperfect self-defense in regard to the section 246 count. The People appealed that ruling. In a partially published opinion, we concluded the trial court had not erred by failing to instruct the jury on imperfect self-defense on count 2. (*Iraheta III*, *supra*, 227 Cal.App.4th at p. 613.) In the unpublished portion of the opinion, we held that the other grounds raised in the new trial motion did not support the grant of a new trial. Accordingly, we reversed the trial court's order and remanded for further proceedings.

On remand, the trial court imposed the midterm of five years on the shooting at an occupied motor vehicle charge, and 25 years to life on the section 12022.53, subdivision (d) enhancement. It ordered victim restitution of $6,080.50 and imposed a $200 restitution fine, a suspended parole revocation fine in the same amount, a court operations fee, and a criminal conviction fee. On the People's motion, the court dismissed the

trial, Los Angeles Superior Court case no. YA053907. (Evid. Code, §§ 452, subd. (d), 459.)

8

murder charge upon which the jury had deadlocked pursuant to section 1385.

Iraheta appeals.

DISCUSSION

1. *Admission of gang evidence*

a. *Additional facts*

The People's theory was that Iraheta was an Inglewood 13 gang member who killed Orozco because he believed Orozco and Martinez to be rival gang members in Inglewood 13 territory. As set forth below, to establish Iraheta's gang membership, the People offered evidence that Iraheta was found on two occasions in the company of Inglewood 13 gang members, and his cellular telephone contained the phone numbers and contact information for numerous gang members. The People also offered expert testimony on the characteristics and culture of the Inglewood 13 criminal street gang.

(i) *Officer Barragan's expert testimony regarding the Inglewood 13 gang*

Inglewood Police Officer Jose Barragan, who had extensive training and experience regarding gangs, testified as an expert on the Inglewood 13 gang. In 2002, the gang had approximately 500 members. It was associated with the Mexican Mafia. A person joins a gang in one of three ways: he is either "jumped in," that is, beaten up; commits crimes for the gang; or has a relative who is a high ranking gang member. Gang members commonly use monikers. Inglewood 13 gang members often wear "I" belt buckles similar or identical to one Iraheta was observed wearing on the night of the shooting and during an earlier contact with police. They typically have Inglewood 13 tattoos, and sometimes have "West L.A." tattoos like Iraheta's.

9

Gang members are required to commit violent crimes such as shootings, assaults, grand thefts, carjackings, homicides, and stabbings. Committing such crimes is known as " 'putting in the work.' " Gang members need guns to commit crimes and retaliate against other gangs. Reputation is enormously important. The gang subculture revolves around respect and status, which are gained through fear, intimidation, and violence directed at the community and rival gang members. If a rival enters another gang's territory, it is a sign of disrespect. If a gang member sees someone believed to be a rival in his own territory and does nothing, he will be considered weak and inferior. The Inglewood 13 gang claimed the entire city of Inglewood as its territory, but gang members were most commonly found in an area bordered by Century, Aviation, and Prairie Boulevards, and 64th Street. Centinela Park was an Inglewood 13 gang "hangout." The Jr. Market was in the center of the gang's claimed territory. The Inglewood 13 gang's rivals included the Culver City Boys gang, whose gang color was red. Martinez was not a gang member.

(ii) *The September 2, 2002 Buick incident*

In response to reports of a robbery and a man with a gun, on September 2, 2002, City of Inglewood Police Officer John Baca and Lieutenant Neal Cochran responded to East Brett Street in Inglewood. They observed three male Hispanics – Ramon Rodriguez, Carlos Carcamo, and Carlos Ordonaz –walking westbound on the sidewalk. One threw an object, later determined to be a gun, under a nearby parked Mazda, and fled; he was captured shortly thereafter. The other two men remained on the scene. Baca and Cochran noticed Iraheta, Tovar, and Christian Muniz seated in a brown Buick parked near the Mazda and contacted them because of concern the Buick might be a

10

"layoff car" used in robberies. Rodriguez, Carcamo, and Ordonaz were arrested. The Buick's occupants were not arrested because they had done nothing wrong.

Cochran completed FI cards on Iraheta and Tovar. Cochran testified that during the contact, Tovar admitted being an Inglewood 13 member with the moniker "Little Drowsy." Cochran wrote "Inglewood 13" on Iraheta's FI card because Iraheta was with Tovar. Cochran also observed that Iraheta had an "LA" tattoo on his left upper arm, which signified a southern California gang under control of the Mexican Mafia. Cochran noted Iraheta was frequenting a gang area and was wearing gang attire, but did not describe at trial the attire he deemed gang-related. Iraheta did not admit gang membership or give a moniker. Muniz likewise did not admit he was a gang member. Without objection, Baca testified: "after we conducted our investigation, we found out that the subjects that were involved in this were Inglewood 13 gang members," as were the occupants of the Buick.

Iraheta testified to an innocent explanation for his presence with Tovar and Muniz. He was a passenger in the car and was waiting for his friend Ivan, who was inside a nearby house settling an argument with his (Ivan's) girlfriend. Ivan was not a gang member. Neither he, Tovar, nor Muniz was involved in a robbery. When an officer repeatedly asked if Iraheta was a gang member, he denied it.

(iii) *The December 2, 2002 Centinela Park incident*

Sergeant Brett Birkbeck testified that on December 2, 2002, he and his partner, Officer Robert Martinez, went to Centinela Park to investigate a report of a man with a gun. When they arrived, they observed a group of approximately

11

10 male Hispanics, including Iraheta, fighting. A gun was on the ground 10 to 15 feet away from the melee. Some of the men ran off, but six, including Iraheta, remained. Officer Martinez (who did not testify at trial) prepared an FI card on Iraheta. The FI card indicated Iraheta was an Inglewood 13 gang member based on four criteria: "[g]ang tattoos, affiliates with gang, frequents a gang area, and gang dress." During the encounter, Birkbeck personally observed Iraheta's "West L.A." tattoo and his "I" belt buckle. Birkbeck testified the persons with whom Iraheta was found were Romeo Vela, Joel Fraticelli, Luis Maciel, Carlos Pineda, and Julio Parra.

Officer Barragan reviewed the police report regarding the Centinela Park incident, reviewed FI cards generated during the investigation, and talked to the officers who were there. Centinela Park had long been an Inglewood 13 hangout, with gang members and gang graffiti present; it was "known for getting jumped in and hanging out." Over an objection that the testimony was hearsay and violated the confrontation clause, Barragan testified that he had spoken to gang members who had been "jumped in" at the park. Over the same objection, Barragan testified that, based on his review of the FI cards, four of the five males detained with Iraheta in the park were self-admitted Inglewood 13 gang members. The trial court ruled that Barragan's review of FI cards was the foundation for his expert testimony. No testimony from the officer or officers who prepared FI cards on Vela, Fraticelli, Maciel, Pineda, or Parra was offered.

Iraheta testified that he was at the park to pick up Melody's younger brother Luis, at the request of Melody's mother. Luis had had an ongoing problem with another youth, Romeo. Iraheta searched the park until he found Luis, grabbed him, and

12

was about to leave when a patrol car pulled up. He did not flee and ensured Luis did not either. He did not participate in the fighting and was not engaged in gang activities.

Yolanda Hernandez (Melody and Luis's mother), testified that after a neighbor notified her that Luis was being beaten up at Centinela Park, she asked Iraheta to go retrieve him.

(iv) *Iraheta's phone contacts*

Officer Barragan reviewed "screen shots" of the contacts listed in Iraheta's cellular telephone at the time Iraheta was arrested. Forty-four of the 98 contacts appeared to Barragan to be monikers, although some contacts were duplicates. Barragan believed some of the listed contacts were monikers because gang members "call[] themselves these types of names." Barragan cross-referenced the monikers and telephone numbers in the phone to those listed on FI cards prepared by other officers at various times, as detailed below. Based on this comparison, Barragan confirmed that 12 of the contacts in Iraheta's phone were of known Inglewood 13 gang members, including Tovar, Raul Guillen, Muniz, Rodriguez, Giovanni Arias, Javier Lara, Martin Fuentes, Omar Gomez, and Christian Cobian.

Detective Daniel Milchovich testified that he completed an FI card on Tovar on January 15, 2002, under circumstances not disclosed in the record. He concluded Tovar was an Inglewood 13 gang member because of Tovar's presence in a gang area, his "I" belt buckle, and his self-admission. Tovar stated his moniker was "Lil Drowsy."

Milchovich prepared an FI card on Guillen on August 2, 2002, under circumstances not disclosed by the record. Iraheta's hearsay objection to the FI card was overruled. Guillen had gang tattoos, affiliated with the gang, had self-admitted Inglewood 13

13

gang membership, gave a moniker of "Lil Crazy," and provided his telephone number. Milchovich observed an "ING" tattoo on Guillen's left arm. Guillen was with Jesus Silva, whom Milchovich identified as an Inglewood 13 gang member. No evidence was adduced as to the basis for Milchovich's knowledge about Silva's gang membership.

Officer Kerry Tripp testified that he had prepared FI cards on seven Inglewood 13 gang members: Muniz, Rodriguez, Arias, Lara, Fuentes, Gomez, and Christian Cobian. He had known each of these men during the mid 1990s and/or 2000s and knew Muniz, Rodriguez, Arias, Lara, Fuentes, and Gomez to be Inglewood 13 gang members. He had observed Rodriguez's and Arias's Inglewood 13-related tattoos. The FI cards stated Muniz and Fuentes also had gang tattoos, but Tripp did not state he had observed them. Whether or not indicated on the FI cards, Tripp knew Muniz's moniker was "Triste"; Rodriguez's was "Gumby" or "Daffy"; Arias's was "Magoo"; Lara's was "Boogie"; and Gomez's was "Sharky." Tripp indicated on the FI cards that Muniz, Arias, and Fuentes had frequented gang areas, and Muniz, Arias, Lara, Gomez, and Cobian sported gang attire, but did not testify to his observations of these attributes. The FI cards indicated Muniz, Arias, and Fuentes affiliated with other gang members. When Tripp prepared the FI cards, he observed Muniz with Juan and Christian Cobian; Rodriguez was with Ordonez and Carcamo; Arias was with Edward Morales and Guillen; Fuentes was with Alan Archaga, Anthony Cabrera, and Carcamo, three "self-admitted" Inglewood 13 gang members; Cobian was on one occasion with his brother Juan, a known Inglewood 13 gang member; and Lara was "sometimes" with other persons Tripp knew to be Inglewood 13 gang members. The phone numbers on

14

the FI cards for all but Rodriguez were provided by the subjects at the time Tripp contacted them.[5] Tripp circled "self-admitted" as an indicator of gang membership on all FI cards except those for Lara and Cobian. It appears, but is not entirely clear, that the men admitted their gang membership to Tripp during the contacts that gave rise to preparation of the FI cards.

The FI card on Arias was completed at the Inglewood jail, sometime after Arias was arrested on unspecified charges. The FI cards for Lara, Cobian, and Fuentes indicated they had been "arrested with" other gang members. Other than for Arias, Tripp did not describe the circumstances under which he encountered the men.

(v) *Officer Barragan's opinion that Iraheta was a gang member and the motive for the crime was gang-related*

Over defense counsel's objection that a question to an expert should be in the form of a hypothetical, Barragan opined that Iraheta was an Inglewood 13 gang member at the time of the shooting. The basis of his opinion was as follows: "I reviewed the facts of this case, reports, obviously F.I. cards, photographs of Mr. Iraheta, the 'West L.A.' tattoo . . . , the 'I' on his belt buckle. [¶] The reports, I reviewed reports where gang members were arrested from Inglewood 13, and Mr. Iraheta was F.I.'d or contacted at that location. I've also reviewed a report where there was a fight or a man-with-a-gun call at Centinela Park where individuals were detained and admitted to being from . . . the Inglewood 13 gang, along with Mr. Iraheta was in their presence. [¶] His phone, I reviewed records of his phone

---

[5] Tripp was not asked where he obtained Rodriguez's telephone information.

15

and contacts which had monikers.  I cross-referenced those phone numbers in his phone with matching monikers of individuals who were from Inglewood 13 at the time of the occurrence or right around that time.  [¶]  The crime itself, I reviewed the facts again . . . of this occurrence, the reports, spoke to the investigating officers, gang detectives who were in the gang unit at the time and the supervisor.  [¶]  So based on the totality of circumstances, all of that, I believe that Carlos Iraheta was an Inglewood 13 gang member.”

When given a hypothetical based upon the evidence – including the assumption that Iraheta was an Inglewood 13 gang member – Barragan opined that the motive for the crime was a “gang motive.”

b. *Iraheta’s contention that admission of gang evidence was irrelevant and unduly prejudicial*

Iraheta makes two arguments regarding admission of the gang evidence.  First, he contends that the gang evidence, particularly evidence of the Centinela Park and Buick incidents, should have been excluded as irrelevant and more prejudicial than probative under Evidence Code section 352, and its admission violated his due process rights.  He complains that no gang enhancement was charged in the case; evidence of the Buick incident insinuated he was somehow involved in a gang-related crime; evidence of the Centinela Park incident suggested he was involved in a gang-related fight; and the evidence served to convince jurors he was a gang member.  But, this was precisely the purpose for which the evidence was offered: to prove Iraheta was an Inglewood 13 gang member.  Given that the People’s theory was that the crime was motivated by gang hostilities, this evidence was highly relevant and not unduly prejudicial.

16

(See generally *People v. McKinnon* (2011) 52 Cal.4th 610, 655.)
We explained as much in the unpublished portion of *Iraheta III*.
Accordingly, this aspect of Iraheta's argument is barred by the
law of the case doctrine. "Under the doctrine of the law of the
case, a principle or rule that a reviewing court states in an
opinion and that is necessary to the reviewing court's decision
must be applied throughout all later proceedings in the same
case, both in the trial court and on a later appeal." (*People v.
Jurado* (2006) 38 Cal.4th 72, 94; *People v. Barragan* (2004)
32 Cal.4th 236, 246; *People v. Stanley* (1995) 10 Cal.4th 764, 786.)
" 'Thus the law-of-the-case doctrine "prevents the parties from
seeking appellate reconsideration of an already decided issue in
the same case absent some significant change in
circumstances." ' " (*People v. Sons* (2008) 164 Cal.App.4th 90, 99;
*People v. Alexander* (2010) 49 Cal.4th 846, 870.)

    c. *Confrontation clause claim*

    Iraheta's contention that the gang expert and other officers
improperly testified to testimonial hearsay in violation of state
law hearsay rules or his federal confrontation clause rights is not
precluded by the law of the case doctrine, and has merit.

    The Sixth Amendment provides that an accused has the
right to be confronted with the witnesses against him. (U.S.
Const., 6th Amend.; *Sanchez, supra,* 63 Cal.4th at p. 679.) In the
seminal case of *Crawford v. Washington* (2004) 541 U.S. 36, the
high court overruled its prior precedent and held that the Sixth
Amendment generally bars admission at trial of a testimonial
out-of-court statement offered for its truth against a criminal
defendant, unless the maker of the statement is unavailable to
testify and the defendant had a prior opportunity for cross-
examination. (*Id.* at p. 68; *Davis v. Washington* (2006) 547 U.S.

17

813, 821; *Sanchez*, at p. 680.)  Although *Crawford* set forth a new standard for admissibility, the court declined to provide a comprehensive definition of "testimonial."  (*Crawford*, at p. 68; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1134.)

In the unpublished portion of *Iraheta III*, we observed that it had long been the law in California that gang experts may rely on reliable hearsay in forming their opinions, and could testify regarding the basis for their opinions, even if the evidence would otherwise be inadmissible.  (Evid. Code, §§ 801, subd. (b), 802; *People v. Gardeley* (1996) 14 Cal.4th 605, 617-618, disapproved by *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13.)  Accordingly, California appellate courts after *Crawford* generally held that the admission of testimonial out-of-court statements or other hearsay evidence offered as the basis for an expert's opinion did not violate *Crawford*, because such statements were not offered for their truth.  We recognized, however, that analysis of the plurality, concurring, and dissenting opinions in the United States Supreme Court's decision in *Williams v. Illinois* (2012) 567 U.S. 50 and the California Supreme Court's decision in *People v. Dungo* (2012) 55 Cal.4th 608 cast doubt on whether these principles were still good law; we also observed that our Supreme Court was considering in *Sanchez* whether a defendant's confrontation rights are violated by a gang expert's reliance on testimonial hearsay.  We concluded that we did not need to reach the question because most, if not all, of the hearsay relied upon by the officers in this case was nontestimonial. *Sanchez*, however, has clarified both the degree to which *Crawford* limits an expert witness from relating case-specific hearsay in explaining the basis for his opinion, as well as the definition of "testimonial" in this context.  Therefore, because of

18

this intervening change in law, the law of the case doctrine does not apply and we must revisit this issue. (*People v. Stanley*, *supra*, 10 Cal.4th at p. 787 [law of the case doctrine will not be adhered to where the "controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations"].)

    (i) *The <u>Sanchez</u> decision*[6]

    In *Sanchez,* the defendant was charged with drug and firearm offenses and active participation in the Delhi street gang, along with a section 186.22 gang enhancement. At trial, a gang expert relied upon a "STEP notice,"[7] police documents, and an FI card[8] as the basis for his expert opinion. Those documents indicated Sanchez associated with, and had been repeatedly contacted by police while in the presence of, Delhi gang members. (*Sanchez*, *supra*, 63 Cal.4th at pp. 671-673.) The expert had

---

[6]     Because the parties completed briefing before *Sanchez* was decided, we requested additional briefing on *Sanchez*'s impact. We have received and considered the parties' letter briefs on the question.

[7]     A STEP notice provides to the recipient information regarding potential penalties for gang-related criminal activity. The issuing officer also records the date, time, statements made at the time of the interaction, and identifying information. (*Sanchez*, *supra*, 63 Cal.4th at p. 672.)

[8]     *Sanchez* described FI cards thusly: "Officers also prepare small report forms called field identification or 'FI' cards that record an officer's contact with an individual. The form contains personal information, the date and time of contact, associates, nicknames, etc.," and may record statements made at the time of the interaction. (*Sanchez, supra*, 63 Cal.4th at p. 672.)

never met Sanchez and had not been present when the STEP notice was issued or during any of Sanchez's other police contacts. His knowledge was derived solely from the police reports and FI card. Based on the information in the STEP notice, the police documents, and the FI cards, and the circumstances of the offense at issue, the expert opined that Sanchez was a member of the Delhi gang and the charged crimes benefitted the gang. (*Id.* at p. 673.)

*Sanchez* held "the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law. They were recited by the expert, who presented them as true statements of fact, without the requisite independent proof. Some of those hearsay statements were also testimonial and therefore should have been excluded under *Crawford*. The error was not harmless beyond a reasonable doubt." (*Sanchez, supra,* 63 Cal.4th at pp. 670-671.) Accordingly, the court reversed the true findings on the street gang enhancements. (*Id.* at p. 671.)

*Sanchez* drew a distinction between an expert's general knowledge and "*case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra,* 63 Cal.4th at p. 676.) At common law, the distinction between case-specific and background facts had been honored by the use of hypothetical questions, in which an examiner could ask an expert to assume certain case-specific facts for which there was independent competent evidence. (*Id.* at pp. 676-677.) However, over time the distinction between background information and case-specific hearsay had become blurred, leading to the rule that

an expert could explain the "matter" upon which he or she relied, even if that matter was hearsay. (*Id.* at pp. 678-679.) California law allowed such hearsay "basis" testimony if a limiting instruction was given; in cases where an instruction was inadequate, the evidence could be excluded under Evidence Code section 352. (*Sanchez*, at p. 679.)

Overruling prior precedent, *Sanchez* concluded "this paradigm is no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Sanchez*, *supra*, 63 Cal.4th at p. 679.) "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. *If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner.*" (*Id.* at p. 684, italics added, fn. omitted.)

*Sanchez* made clear that its holding did not do away with all gang expert testimony. "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so," that is, he or she may "relate generally" the "kind and source of the 'matter' upon which his opinion rests." (*Sanchez*, *supra*, 63 Cal.4th at pp. 685-686.) "Gang experts, like all others, can rely on background information accepted in their field of

21

expertise under the traditional latitude given by the Evidence Code.  They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven.  They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception." (*Id.* at p. 685.)  "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*Id.* at p. 686.)

Thus, in regard to case-specific hearsay, *Sanchez* "jettisoned" the former "not-admitted-for-its-truth" rationale underlying the admission of expert basis testimony, and occasioned a "paradigm shift" in the law.  (*People v. Stamps* (2016) 3 Cal.App.5th 988, 994-995; *People v. Ochoa* (2017) 7 Cal.App.5th 575, 588.)

*Sanchez* then turned to consideration of what constitutes testimonial hearsay, a question not yet clearly defined by the United States Supreme Court.  (*Sanchez, supra*, 63 Cal.4th at p. 687.)  Prior testimony and police interrogations are clearly testimonial.  (*Ibid.*)  *Sanchez* explained that beyond these clear categories, the high court had articulated several formulations for determining the testimonial nature of out-of-court statements. Under the "primary purpose" test, "[t]estimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, at p. 689.) Whether the statements were spontaneous or given in a formal or informal setting is also relevant.  (*Id.* at pp. 693-694; see *Ohio v.*

22

*Clark* (2015) \_\_\_U.S. \_\_ [135 S.Ct. 2173].)  *Sanchez* concluded that statements about a completed crime, made to an investigating officer by a nontestifying witness (unless made in the context of an ongoing emergency or for some primary purpose other than preserving facts for use at trial), were generally testimonial.  (*Sanchez*, at p. 694.)  Accordingly, the police reports in *Sanchez* were testimonial.  (*Ibid.*)  Likewise, at least the portion of a STEP notice retained by police is testimonial.  That portion records defendant's biographical information, whom he was with, and what statements he made; the officer's purpose is to establish facts to be later used against the defendant or his companions at trial; and the notice is part of an official police form containing the officer's sworn attestation.  (*Sanchez*, at pp. 696-697.)

The court concluded FI cards "may be testimonial." (*Sanchez*, *supra*, 63 Cal.4th at p. 697.)  *Sanchez* explained that "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Ibid.*)  However, because the parties had not focused on the point below, and the origins of the FI cards at issue there were confusing, *Sanchez* did not decide whether the content was testimonial or not, given that the expert's testimony based on the police and STEP reports required reversal in any event.  (*Id.* at pp. 697-698.)

(ii)  *Application here*

To determine whether Officer Barragan's expert testimony, or that of the other officers, was prejudicial error we use the "two-step analysis" required by *Sanchez*.  "The first step is a traditional hearsay inquiry:  Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and

23

does it fall under a hearsay exception?  If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required.  Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term."  (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)  An improperly admitted hearsay statement ordinarily constitutes statutory error under the Evidence Code.  (*Id.* at p. 685.)  Where the hearsay is testimonial and is admitted in violation of *Crawford,* the error is one of federal constitutional magnitude.  (*Ibid.*)

The gang evidence adduced here is comprised of a mixture of admissible evidence, evidence that violated state hearsay rules, and evidence that violated the federal confrontation clause.

A.  *Officer Barragan's general testimony about the gang*

Officer Barragan's expert testimony regarding the general attributes of the Inglewood 13 gang, such as the gang's culture, the importance placed on reputation and guns, the requirements to join or leave the gang, the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, were permissible as expert background testimony.  (*Sanchez*, *supra*, 63 Cal.4th at p. 685; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1175 [a gang's operations, primary activities, and pattern of criminal activities are background facts, not case-specific facts, under *Sanchez*], review granted March 22, 2017, S239442, opn. ordered to remain precedential; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411-412.)  For example, *Sanchez* explained that an expert's opinion that a particular tattoo indicated gang membership was background information.  (*Sanchez*, at p. 677.)

24

There is no showing Barragan's knowledge of these background facts was based on testimonial hearsay. Instead, his testimony on these points appears to have been based on his training, education, and experience. (See *People v. Meraz*, at pp. 1175-1176.)

B. *Testimony regarding Tovar*

Tovar's statements to Lieutenant Cochran and Detective Milchovich that he was an Inglewood 13 gang member and his moniker was "Lil Drowsy" were hearsay; they were case-specific, out-of-court statements offered for the truth of the matter asserted. (See *Sanchez*, *supra*, 63 Cal.4th at p. 674.) However, Tovar testified for the defense at trial. He confirmed that his moniker was "Drowsy"; that his phone number was listed by his moniker in Iraheta's cellular telephone; and that he had been an Inglewood 13 gang member from 1996 to 1999. Later in his testimony he seemed to suggest he was a gang member at the time of the shooting. Iraheta also testified that he knew Tovar was an Inglewood 13 gang member. Thus, assuming arguendo Cochran's and Milchovich's testimony about Tovar's out-of-court statements was not covered by an exception to the hearsay rule, any state law hearsay error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; Evid. Code, § 353, subd. (b).) Because Tovar testified, the federal confrontation clause was not violated. " 'The Sixth Amendment confrontation clause does not bar hearsay statements of a witness who testifies at trial and is subject to cross-examination.' " (*People v. Clark* (2016) 63 Cal.4th 522, 601; *People v. Stevens* (2007) 41 Cal.4th 182, 199, citing *Crawford*, *supra*, 541 U.S. at p. 60, fn. 9.)

C.  *Officers' personal observations*

Personal observations by any officer of Iraheta's or other subjects' tattoos, attire, companions, and location were not hearsay.  Thus, Cochran's and Birkbeck's observations of Iraheta's tattoo, Birkbeck's and Milchovich's observations of Iraheta's or Tovar's "I" belt buckles, and Milchovich's or Tripp's observations of Guillen's, Rodriguez's, and Arias's gang-related tattoos were admissible evidence.  Likewise, Baca's, Cochran's, and Birkbeck's descriptions of the activities they observed during the Buick and Centinela Park incidents was based on their personal knowledge and was not hearsay.  And, because these officers testified at trial, Barragan was entitled to rely on their testimony regarding these matters as the basis for his expert opinion.  (See *Sanchez, supra*, 63 Cal.4th at p. 684 ["the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner"].)

D.  *Officer Tripp's knowledge of gang membership and monikers*

Officer Tripp's testimony that he knew Muniz, Rodriguez, Arias, Lara, Fuentes, Gomez, and Cobian were gang members, and that he knew five of the men's monikers, was likewise not hearsay.  His testimony was apparently based on his personal knowledge, and the defense did not object on foundational grounds or seek to elicit the basis for his knowledge.

E.  *FI cards and related testimony*

The FI cards referenced by expert Barragan as the basis for his opinion that four of the five men found with Iraheta at Centinela Park were self-admitted Inglewood 13 gang members constituted testimonial hearsay.  The information in the FI cards

26

was double hearsay. The FI card subjects' admissions that they were gang members were out-of-court statements offered for their truth, and none of the FI card subjects testified at trial. (See *People v. Ochoa, supra*, 7 Cal.App.5th at p. 583.) Barragan was not present when the subjects admitted their gang membership, and the officer or officers who prepared the FI cards did not testify. Barragan related facts in the FI cards as the basis for his conclusion that the men were gang members. (See *Sanchez, supra*, 63 Cal.4th at pp. 674-675; *People v. Meraz, supra*, 6 Cal.App.5th at p. 1176 [hearsay rules barred admission of officer's testimony on FI cards and arrest report completed by other officers outside his presence, which conveyed case-specific information]; *People v. Lara* (2017) 9 Cal.App.5th 296, 337.) The evidence was not general background information, but included case-specific facts: that persons found in Iraheta's company were self-admitted gang members. Their gang membership was offered to show Iraheta was involved in a gang initiation, as proof he was an active Inglewood 13 gang member. "If it is a case-specific fact and the witness has no personal knowledge of it, if no hearsay exception applies, and if the expert treats the fact as true, the expert simply may not testify about it." (*People v. Stamps, supra*, 3 Cal.App.5th at p. 996; *People v. Ochoa, supra*, 7 Cal.App.5th at p. 589.)

Further, the statements contained in the FI cards were testimonial. *Sanchez* concluded FI cards "may" be testimonial, but did not hold they always are. (*Sanchez, supra*, 63 Cal.4th at p. 697.) Statements made to officers in the course of informal interactions, and not gathered for the primary purpose of use in a later criminal prosecution, are not generally testimonial. (*People v. Ochoa, supra*, 7 Cal.App.5th at p. 585; *People v. Valadez* (2013)

27

220 Cal.App.4th 16, 35-36.) But *Sanchez* reasoned that if an FI card is "produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Sanchez*, at p. 697.) Here, the FI cards were prepared in the course of an investigation by multiple officers into the activities at the park, which had been initiated by a report to police of a man with a gun. "When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial." (*Sanchez*, at pp. 694-695.) Although no one was arrested for a crime, it seems clear the officers were investigating a potential crime. Since the cards were produced in the course of an ongoing investigation, they are akin to police reports and therefore testimonial.[9] (*Id.* at p. 697.) Counsel interposed hearsay and

[9]    The People point out that in the unpublished portion of *Iraheta III* we stated that "nothing in the record suggests the officers' purpose in speaking with the gang members was to develop information regarding the instant crimes." (*Iraheta III, supra*, B249264.) However, given our Supreme Court's clarification that statements about a completed crime, made to an investigating officer by a nontestifying witness, or produced in the course of an ongoing criminal investigation, are generally testimonial (see *Sanchez, supra*, 63 Cal.4th at pp. 694, 697), it is clear that the statements made to officers in the park were testimonial.

      The People further suggest that the statements cannot be considered testimonial because the "record leaves open the possibility" that the FI cards were prepared for general community policing responsibilities unrelated to use in criminal

confrontation clause objections, which were overruled based on the interpretation of the law applicable at the time.  Thus, admission of the evidence violated the confrontation clause. (*Sanchez*, *supra*, 63 Cal.4th at pp. 670-671, 698.)

Barragan's statement that he had spoken to gang members who had been "jumped in" in Centinela Park was likewise hearsay.  It was a case-specific, out-of-court statement offered for its truth.

F.  *Testimony regarding telephone numbers and gang membership*

Detective Milchovich and Officer Tripp testified to preparation of FI cards on eight subjects in addition to Tovar: Guillen, Muniz, Rodriguez, Arias, Lara, Fuentes, Gomez, and Cobian.  Much of the officers' testimony pertained to their notations on the FI cards of their nonhearsay observations of the subjects.  However, the officers testified to two types of hearsay which, for our purposes, is significant.  First, the officers testified that six of the subjects "self-admitted" their gang membership. The declarants did not testify.  The officers' testimony that the

_____

prosecutions.  But the officers did not testify to such a purpose. To the extent their testimony touched on the question, it does not support the People's argument.  Officer Baca stated FI cards could be prepared "for gang contacts" or for "an informational report," and would be given to gang detectives.  Detective Milchovich testified that he typically noted as many indicia of gang membership as possible on FI cards in order to make a "stronger indication" if, among other things, he had to testify in court.  This testimony does not suggest the FI cards, especially those prepared in regard to the Buick and Centinela Park incidents, were completed primarily for community policing efforts.

29

subjects stated they were gang members was offered for the truth of the matter asserted, that is, that the subjects were in fact gang members. (Evid. Code, § 1200; see *Sanchez*, *supra*, 63 Cal.4th at p. 674.) The statements were case-specific; the evidence was aimed at demonstrating Iraheta associated with gang members and was therefore a gang member himself. For the same reason, evidence that Archaga, Cabrera, and Carcamo (who were observed with FI subject Fuentes) were "self-admitted" Inglewood 13 gang members was hearsay. (*People v. Ochoa*, *supra*, 7 Cal.App.5th at pp. 583, 589.)

Second, seven of the subjects provided their telephone numbers to the officers during the encounters, and the officers recorded the numbers on the FI cards. Barragan used the phone numbers on the FI cards as the primary basis for his conclusion that the contacts in Iraheta's cellular telephone belonged to fellow Inglewood 13 gang members. The telephone numbers were only relevant if offered for their truth. In other words, Barragan's comparison depended, at least in part, for its accuracy on the assumption that the phone numbers – which were provided in out-of-court statements, by nontestifying witnesses – were accurate. The statements by the FI card subjects as to their phone numbers were thus case-specific hearsay. (See *People v. Meraz*, *supra*, 6 Cal.App.5th at p. 1176; *People v. Stamps*, *supra*, 3 Cal.App.5th at p. 996; *People v. Ochoa*, *supra*, 7 Cal.App.5th at p. 583.) Barragan apparently relied upon three additional FI cards in performing his comparison, but there was no in-court testimony regarding the preparation of those cards.[10]

---

[10] Barragan testified that he relied upon FI cards to determine that 12 of the contacts in Iraheta's cellular telephone

For the most part, the record is insufficiently developed to allow us to determine whether the aforementioned statements were testimonial. It appears the FI cards on Arias, Lara, Cobian, and Fuentes were testimonial; the card for Arias was prepared at the jail after Arias's arrest, and the other FI cards indicated the subjects were arrested with other gang members or for gang-related crimes. To the extent these facts suggest the FI cards were prepared in the course of an ongoing investigation, they were testimonial. (See *Sanchez*, *supra*, 63 Cal.4th at p. 697.) However, the record is too sparse to allow a definitive conclusion. As to the remaining evidence, the record does not disclose the nature of the contacts between the officers and the FI card subjects, hindering analysis of the statements' nature.

In the face of this undeveloped record, the People argue that because defense counsel failed to consistently and specifically object on hearsay and confrontation clause grounds, Iraheta's confrontation clause claim has been forfeited. (See *People v. Ochoa*, *supra*, 7 Cal.App.5th at p. 586 ["due to defendant's failure to object, the record is not clear enough for this court to conclude which portions of the expert's testimony involved testimonial hearsay"; accordingly, there was no showing the confrontation clause was violated].) Iraheta counters that counsel's objections were sufficient, and in any event, more specific or additional confrontation clause objections would have been futile because at the time of trial, *People v. Gardeley*, *supra*, 14 Cal.4th 605 allowed an expert to testify to hearsay evidence that formed the basis of the expert's opinion. (See *People v.*

were gang members, that is, the eight subjects discussed above, plus Tovar, plus three other unnamed persons.

31

*Meraz*, *supra*, 6 Cal.App.5th at p. 1170, fn. 7 [prior to *Sanchez*, failure to object on confrontation grounds would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert "basis" evidence did not violate confrontation clause]; *Conservatorship of K.W.* (2017) __ Cal.App.5th __ [2017 Cal.App.Lexis 678]; *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 507-508.) Indeed, when defense counsel eventually made a continuing objection to evidence related to the FI cards, the trial court concluded, in accord with the law in effect at the time (see *People v. Stamps*, *supra*, 3 Cal.App.5th at pp. 993-994) that an expert could state the basis for his opinion.

But we need not determine whether testimony regarding self-admission of gang membership by Guillen, Muniz, Rodriguez, Gomez, Arias, Fuentes, Archaga, Cabrera, and Carcamo, or the provision of telephone numbers, was testimonial. Even if the evidence was admitted in violation of state law hearsay rules only, when considered along with the confrontation clause violation discussed *ante*, the evidentiary errors were prejudicial, as we explain.

(iii)  *Prejudice*

The parties treated the question of Iraheta's gang membership as a pivotal issue in the case. The prosecutor argued the evidence demonstrated "this was nothing less than a cold-blooded murder in which this defendant, due to his affiliation, membership, whatever you want to call it with the Inglewood 13 gang, when he had that conversation with . . . Tovar, 'Drowsy,' he followed that car, and he killed Michael Orozco." The prosecutor urged that "Motive is important in this case. Because if you're reasonable and you listen to all the evidence . . . the motive for

this crime was, in fact, a gang, Inglewood 13 specifically." Defense counsel argued that in order to accept the prosecution's theory, "you have to assume that [Iraheta] is a gang member, which clearly he's not . . . ."

Iraheta's only viable defense to the section 246 charge was "perfect" self-defense. (See *Iraheta III, supra*, 227 Cal.App.4th at pp. 617-624.) Iraheta's jury was instructed that a defendant acts in self-defense when he reasonably believes that he or another is in imminent danger of being killed or suffering great bodily injury; he reasonably believes that the immediate use of deadly force is necessary to defend against that danger; and he uses no more force than is reasonably necessary. (CALCRIM No. 505; see generally *People v. Hernandez* (2011) 51 Cal.4th 733, 747.) Such a belief may be reasonable even if the danger did not actually exist or the defendant relied on information that was not true. A defendant is not required to retreat, but may stand his ground and defend himself if reasonably necessary. (CALCRIM No. 505; see *People v. Ross* (2007) 155 Cal.App.4th 1033, 1044, fn 13.) The People have the burden to prove a defendant did not act in self-defense. (CALCRIM No. 505; *People v. Saavedra* (2007) 156 Cal.App.4th 561, 571.) Evidence that Iraheta was a gang member went directly to the genuineness of his belief. His gang membership, or lack thereof, was crucial to both the defense and the prosecution theories, to demonstrate he shot either from a gang-related motive, or that he lacked such a motive and shot in self-defense.

There was considerable admissible evidence suggesting Iraheta was an Inglewood 13 gang member, including his "West L.A." tattoo; his "I" belt buckle; his presence in gang territory; and his presence with Tovar and Muniz in a car near where three

other men – one of whom, Rodriguez, was known to Tripp as a gang member – threw a gun. There was also evidence Iraheta was observed fighting with a group of Hispanic men or youths in Centinela Park, and his phone contained numerous contacts which, according to an experienced gang officer, appeared to be gang monikers. Some of the names in the phone corresponded to monikers Tripp testified belonged to gang members. Iraheta had a gun at the ready in his car on the night of the shooting. Further, the circumstances of the crime suggested the shooting might have been in retaliation for the presence of persons perceived to be gang rivals in Inglewood 13 territory. Moreno told police in an interview shortly after the crime that Iraheta had followed the Honda. The prosecution also attempted to show the route Iraheta took from the Jr. Market suggested he intended to confront the persons in the Honda.

On the other hand, Iraheta presented considerable evidence undercutting the prosecution's evidence. He consistently denied being a gang member and there was no evidence he had ever self-admitted to any police officer. Until the current offense, he had never been arrested or convicted of a crime. He was a high school graduate, and also claimed he was enrolled in ITT Tech and scheduled to start classes the following month. Melody, in her interview with police shortly after the shooting, stated she had been dating Iraheta for two months and did not know he was a gang member. It was undisputed he enlisted in the military in 2001 and was in the Army National Guard Reserve at the time of the shooting; two witnesses testified that they attended basic training with him. He claimed he had just been hired by Bank of America, and Melody backed this claim up in her police interview; she explained they had been shopping for work clothes

for him the morning of the shooting.  While the facts Iraheta was in the military and had a job lined up did not disprove he was a gang member, jurors were likely to conclude this evidence tended to show he was less likely to be focused on gang-related activities or membership.  There were no photographs of Iraheta flashing gang signs, and there was no evidence gang signs or challenges were used during the shooting.  Barragan conceded he knew of no active Inglewood 13 gang members who were in the military, had a legal job, were enrolled in school, had never self-admitted, and had no Inglewood 13 gang tattoos, although many gang members had jobs.

Iraheta's mother lived in Inglewood, and he lived with her part of the time, diminishing the significance of his presence in Inglewood gang territory.  Iraheta claimed his "West L.A." tattoo was not gang-related.  The defense gang expert testified that a "West L.A." tattoo did not necessarily indicate gang membership.  Tattoos are ubiquitous, and "West L.A." does not indubitably signify gang allegiance in the way that a more specific tattoo, such as "Inglewood 13," would.  According to Iraheta, his "I" belt buckle did not stand for "Inglewood," but for his last name; he explained he had worn initial belt buckles since childhood and provided a photo of himself wearing a "C" buckle as a child.  Melody and Moreno confirmed that the group had been headed to Universal City Walk to go to the movies, corroborating Iraheta's account.  It was undisputed Melody, who was seated in the Camaro's passenger seat parallel to the Honda, was pregnant at the time of the shooting.  Barragan had not heard of an Inglewood 13 gang member committing a gang shooting with his pregnant girlfriend and teen brothers in the car, although he

knew gang members would commit crimes in front of their families and girlfriends.

Iraheta's innocent explanation for his presence at Centinela Park was corroborated by Melody's mother, Hernandez, who testified that she had asked Iraheta "[t]o go and pick up" her son Luis at Centinela Park "because he was being beat up." One of the names of the persons found with Iraheta at the park was Luis Maciel. Iraheta offered an innocent explanation for the Buick incident as well. He explained he sometimes carried a gun in his car because he had been beaten up approximately six months prior to the shooting when he had been attacked by gang members after he denied gang membership. He admitted having Tovar's name in his phone, and that Tovar was a gang member. He also admitted having "Giovanni's" number (presumably Arias's) in his phone, and confirmed he knew that Giovanni was an Inglewood 13 gang member; however, they had known each other since they were children and Iraheta did not end their friendship when Giovanni joined a gang. Iraheta identified other names in his contacts as friends from the military or elsewhere, relatives, or members of his roller hockey league, none of whom were gang members.

Against this background, we cannot conclude the improperly admitted evidence was harmless beyond a reasonable doubt. (*Sanchez*, *supra*, 63 Cal.4th at pp. 698-699; *Chapman v. California* (1967) 386 U.S. 18.) The People's primary method of proving Iraheta's gang membership was by showing his association with Inglewood 13 gang members. The other evidence – the tattoo and the "I" belt buckle – was comparatively weak. Evidence Iraheta's cellular telephone was chock full of gang member contacts provided far stronger proof he was an

36

Inglewood 13 member.  Evidence that the persons in Centinela Park with Iraheta were all Inglewood 13 gang members, and Barragan's testimony he had been told by gang members that they had been "jumped in" there, strongly suggested Iraheta was participating in a gang initiation ceremony.  Such evidence was compelling proof he was a gang member and directly contradicted Hernandez's testimony that she sent Iraheta there for an innocent purpose.  Arguably, Barragan's testimony that he knew the park was used for this purpose, without addition of the statement he had been so informed by gang members, would have been admissible as background information.  But even so, his reliance on FI cards completed by officers who did not testify at trial as the basis for his opinion that all the men in the park with Iraheta were gang members was compelling evidence Iraheta was there for gang-related purposes.  Furthermore, although Officer Tripp testified that he knew Muniz, Rodriguez, Arias, Lara, Fuentes, Gomez, and Cobian were gang members, the basis for his opinion was not established.  Any skepticism jurors may have had about the accuracy of Tripp's beliefs was likely confirmed by hearsay statements on the FI cards that these men were self-admitted gang members.

Certainly, there was ample evidence to support the jury's verdict.  Nonetheless, given the quantity and tenor of the gang evidence, and its importance to a crucial issue in the case, we cannot say the errors were harmless beyond a reasonable doubt. (See *Sanchez, supra*, 63 Cal.4th at pp. 685, 698-699; *People v. Meraz, supra*, 6 Cal.App.5th at p. 1176.)

37

2. *Iraheta's vindictive prosecution and statute of limitations arguments lack merit*

Iraheta argues that the section 246 charge was time-barred, and its addition after his successful appeal constituted vindictive prosecution. If meritorious, either of these contentions would require dismissal of the section 246 charge and would preclude Iraheta's retrial on that count. Therefore we address his contentions even though we have concluded his conviction must be reversed.

a. *Additional facts*

The original information in this case was filed on May 1, 2003, and charged Iraheta with murder (§ 187, subd. (a)), along with the allegation that he personally and intentionally used and discharged a firearm, causing death (§ 12022.53, subds. (b), (c) & (d)). The court instructed the jury on first degree murder, as well as three theories of second degree murder: (1) an intentional killing where the evidence was insufficient to prove premeditation and deliberation; (2) an unintentional killing resulting from a dangerous act performed with conscious disregard for human life; and (3) second degree felony murder based on a killing committed while shooting at an occupied motor vehicle in violation of section 246. The jury was further instructed that to prove the third theory, the People were required to establish "[t]he specific intent to commit Shooting at an Occupied Vehicle and the commission or attempted commission of that crime" beyond a reasonable doubt. Accordingly, the jury was instructed on the elements of shooting at an "inhabited" vehicle in violation of section 246. It acquitted Iraheta of first degree murder, but convicted him of second degree murder, and found the section 12022.53 firearm

allegations true.  As noted, we affirmed the judgment in *Iraheta I.*

Thereafter the Supreme Court granted review and transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of *People v. Chun, supra*, 45 Cal.4th 1172.  In *Chun*, the court overruled its own prior decisions and concluded that when "the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, . . . the felony merges with the homicide and cannot be the basis of a felony-murder instruction."  (*Id.* at pp. 1178, 1200.) *Chun* reasoned that shooting at an occupied vehicle under section 246 was one such assaultive crime, and therefore could not serve as the underlying felony for purposes of the felony-murder rule. (*Chun*, at pp. 1178, 1200.)  In light of *Chun,* we concluded the trial court had prejudicially erred by instructing that section 246 could serve as the basis for the felony-murder instruction, and reversed.

On remand, the People filed an amended information charging Iraheta with murder (§ 187, subd. (a), count 1), and adding a second count of shooting at an occupied motor vehicle (§ 246, count 2).  The section 12022.53 allegations that had previously been alleged as to the murder charge were also alleged in regard to the section 246 charge.  Iraheta moved to dismiss the section 246 count and the attached section 12022.53 allegations on the ground their addition constituted vindictive prosecution. The trial court denied the motion.

At Iraheta's second trial, the jury convicted him of shooting at an occupied motor vehicle in violation of section 246, and found the section 12022.53, subdivisions (b), (c), and (d) firearm

enhancements true.  It deadlocked on the second degree murder charge, and the trial court declared a mistrial on that count.

Before sentencing, Iraheta filed a motion for a new trial on a variety of grounds.  He also brought a motion in arrest of judgment, arguing that the section 246 count was time-barred and the People had failed to plead facts showing otherwise; further, addition of the section 246 charge constituted vindictive prosecution.  The trial court granted the new trial motion on the ground that it had erred in failing to instruct the jury on imperfect self-defense in regard to the section 246 count, and as noted, we subsequently reversed its order granting the new trial. (*Iraheta III*, *supra*, 227 Cal.App.4th at p. 613.)  In the unpublished portion of the opinion, we held that the other grounds raised in the new trial motion did not support the grant of a new trial.  We did not consider whether amendment of the complaint to add the section 246 charge was permissible, i.e., whether the charge was time-barred or constituted vindictive prosecution.

On remand, Iraheta brought a renewed series of motions challenging the amendment to the information on vindictive prosecution and statute of limitations grounds.  He also attempted to revive his motion for a new trial on a variety of grounds, primarily those we had considered and rejected when we determined that the grant of the previous new trial motion could not be affirmed.  The trial court ruled that under section 803, subdivision (b), the statute of limitations was tolled during pendency of the murder case, which involved the same conduct; therefore there was no time-bar.  It found no presumption of vindictiveness arose because the addition of the section 246 charge did not increase Iraheta's potential punishment.

b. *Vindictive prosecution*

The "due process clauses of the federal and state Constitutions (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15) forbid the prosecution from taking certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. [Citations.]" (*People v. Jurado, supra*, 38 Cal.4th at p. 98; *In re Bower* (1985) 38 Cal.3d 865, 869.)  "It is 'patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.'  [Citation.]" (*People v. Valli* (2010) 187 Cal.App.4th 786, 802.)

Due process protects against both an actual vindictive prosecution and the apprehension of retaliation for exercising the right to appeal.  (*In re Bower, supra*, 38 Cal.3d at pp. 874, 877-878; *People v. Villanueva* (2011) 196 Cal.App.4th 411, 418.) Because the doctrine seeks to reduce or eliminate apprehension on the part of an accused that he may be subject to retaliatory punishment for attempting to exercise his procedural rights, the mere appearance of vindictiveness is enough to place the burden on the prosecution.  (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371.)  " 'The presumption is not based on the subjective state of mind of the individual prosecutor and does not imply that he or she individually harbors an improper motive.' " (*People v. Villanueva, supra*, at p. 419; *In re Bower*, at p. 879.)

Thus, the "presumption of unconstitutional vindictiveness is a legal presumption which arises when the prosecutor increases the criminal charge against a defendant under circumstances which . . . are deemed to present a 'reasonable likelihood of vindictiveness.' " (*In re Bower, supra*, 38 Cal.3d at p. 879; *People v. Ledesma* (2006) 39 Cal.4th 641, 731 [an

41

"inference of vindictive prosecution is raised if, upon retrial after a successful appeal, the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial"]; *Twiggs v. Superior Court, supra*, 34 Cal.3d at p. 371 ["Where the defendant shows that the prosecution has increased the charges in apparent response to the defendant's exercise of a procedural right, the defendant has made an initial showing of an appearance of vindictiveness"]; *Blackledge v. Perry* (1974) 417 U.S. 21, 28 [state may not retaliate by "substituting a more serious charge for the original one, thus subjecting [the defendant] to a significantly increased potential period of incarceration"].)

"[O]nce the presumption of vindictiveness is raised the prosecution bears a heavy burden of rebutting the presumption with an explanation that adequately eliminates actual vindictiveness." (*Twiggs v. Superior Court, supra*, 34 Cal.3d at p. 374; *People v. Valli, supra*, 187 Cal.App.4th at p. 803.) " 'In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) that the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge.' [Citation.]" (*People v. Valli*, at p. 803; *In re Bower, supra*, 38 Cal.3d at p. 879.)

Here, the relevant facts are undisputed; therefore we exercise our independent judgment to resolve the legal question of whether a presumption of vindictiveness arose. (See generally *People v. Cromer* (2001) 24 Cal.4th 889, 893-894.)

We conclude no presumption of vindictiveness arose because the addition of the section 246 charge did not "increase[ ] the charges so that the defendant face[d] a sentence potentially more severe than the sentence he . . . faced at the first trial" (*People v. Ledesma, supra*, 39 Cal.4th at p. 731), nor did it increase the charges under circumstances deemed to present a reasonable likelihood of vindictiveness (*In re Bower, supra*, 38 Cal.3d at p. 879).

Shooting at an occupied motor vehicle is a less serious charge than murder.  It carries a penalty of three, five, or seven years (§ 246; *People v. Williams* (2014) 227 Cal.App.4th 733, 742), whereas second degree murder is punishable by 15 years to life in prison (§ 190, subd. (a)).  Conviction of the section 246 charge therefore resulted in a *lesser* sentence than conviction of the murder charge would have.

Had the jury convicted Iraheta of both the murder and the section 246 charge, no additional punishment would have been permissible because section 654 would have required a stay of sentence on the section 246 charge.[11]  The same is true in regard to the section 12022.53 firearm enhancements.  Had Iraheta been convicted of both crimes, he could not have been sentenced to

---

[11]    Section 654, subdivision (a), bars multiple punishments for separate offenses arising out of a single occurrence where all were incident to an indivisible course of conduct or a single objective.  (*People v. Jackson* (2016) 1 Cal.5th 269, 354; *People v. Capistrano* (2014) 59 Cal.4th 830, 885-886; *People v. Calderon* (2013) 214 Cal.App.4th 656, 661.)  Here, both the murder and the section 246 charge were based on identical conduct – Iraheta's shooting of Orozco – and were clearly carried out with a single intent and objective.

more than one section 12022.53 enhancement.  When the base term of a sentence is stayed under section 654, the attendant enhancements must also be stayed.  (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1221; *People v. Guilford* (1984) 151 Cal.App.3d 406, 411.)  Thus, no presumption of vindictiveness arose due to a potential increase in punishment.

Nor did the People increase the charges under circumstances that appear vindictive.  The addition of the section 246 charge after Iraheta's successful appeal was based on a change in the law wrought by *People v. Chun*, and therefore did not suggest vindictiveness.  The section 246 count could not logically have been charged in the original trial.  Based on the then-applicable law, the People relied on the section 246 charge as the basis for a second degree felony murder theory.  In order to prove that theory, the jury had to find beyond a reasonable doubt that Iraheta committed the offense of shooting at an occupied motor vehicle.  Since the jury could not find Iraheta guilty of felony murder without also finding him guilty of shooting at a motor vehicle, there would have been little point in separately charging the section 246 count.  In other words, if the People had charged Iraheta with a substantive section 246 charge *and* tried him on a felony murder theory based on the same 246 charge, the jury would have either acquitted him of both (if it found he was not guilty of shooting at an occupied motor vehicle) or convicted him of both.  The substantive section 246 charge would have been redundant.

For similar reasons, we reject Iraheta's argument that the addition of the section 246 charge deprived him of a defense.  His argument runs as follows.  The imperfect self-defense doctrine operates to reduce a murder to voluntary manslaughter.  (See

44

*Iraheta III, supra*, 227 Cal.App.4th at p. 620.) The imperfect self-defense doctrine does not apply to the offense of shooting at an occupied motor vehicle. (*Id.* at p. 624.) Therefore, at the second trial he was unable to advance an imperfect self-defense theory in regard to the newly added section 246 charge. He posits that after the People became aware of his intended defense at the first trial, they added the new count in order to "deprive [him] of his defense."

The flaw in this argument is that at the first trial Iraheta had no right to an imperfect self-defense theory on *all* charges either. Then, as now, imperfect self-defense was not a defense to felony murder. (*People v. Seaton* (2001) 26 Cal.4th 598, 665; *People v. Tabios* (1998) 67 Cal.App.4th 1, 8-9, disapproved by *People v. Chun, supra*, 45 Cal.4th at p. 1199.) Prior to *People v. Chun*, the People relied on a then-viable felony murder theory, based on section 246, to which the imperfect self-defense doctrine did not apply. After *Chun*, at the second trial, the jury was given the option of convicting Iraheta of the less serious offense of shooting at an occupied motor vehicle, to which the imperfect self-defense doctrine likewise did not apply. Thus, both before and after the successful appeal, Iraheta was faced with a theory of culpability to which his imperfect self-defense theory could not apply.[12]

---

[12] Iraheta cites our prior opinion in *Iraheta II*, B173223, in support of his argument that he was deprived of a defense. But our ruling there does not support his vindictive prosecution claim. When considering whether the trial court's instructional error was prejudicial, we applied *Chun*'s harmless error test, i.e., whether "other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for

45

In sum, the post-appeal amendment of the information to add the section 246 count did not " ' "up the ante." ' " (See generally *People v. Villanueva*, *supra*, 196 Cal.App.4th at p. 419.) It neither exposed Iraheta to a more severe sentence nor deprived him of a defense that was available to all charges at the first trial.

c. *The section 246 charge was not time-barred*

Iraheta next argues that the statute of limitations barred prosecution for shooting at an occupied motor vehicle in violation of section 246.[13] The trial court concluded that because the

---

conscious-disregard-for-life malice." (*People v. Chun*, *supra*, 45 Cal.4th at p. 1205.) Iraheta's jury had been instructed, and the prosecutor had argued, that imperfect self-defense did not apply to felony murder. Therefore, because Iraheta's imperfect self-defense claim was potentially viable in regard to the murder charge, and because the jury never had to consider it in regard to the felony murder theory, it was not clear beyond a reasonable doubt that the jury made the requisite findings to render the error harmless. (*Iraheta II*, *supra*, B173223.) In other words, we could not say the jury necessarily found Iraheta guilty under one of the remaining, legally proper theories. But our prejudice analysis does not suggest the conclusion that trying Iraheta on the section 246 offense was improper.

[13]   It does not appear that Iraheta moved to dismiss the section 246 charge on statute of limitations grounds before the 2013 retrial, but this is inconsequential. Where the "charging document indicates on its face that the charge is untimely, absent an express waiver, a defendant convicted of that charge may raise the statute of limitations at any time." (*People v. Williams* (1999) 21 Cal.4th 335, 338, 341; *People v. Johnson* (2006) 145 Cal.App.4th 895, 900.)

section 246 charge pertained to the same conduct as the murder charge, section 803 applied to toll the statute of limitations. Exercising our independent judgment on the undisputed facts presented here (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191), we conclude the trial court was correct.

The statute of limitations for a section 246 offense is three years. (See §§ 801, 246; *People v. Johnson*, *supra*, 145 Cal.App.4th at p. 900.)  Iraheta committed the shooting on December 20, 2002.  The original information charging Iraheta with murder was filed on  May 1, 2003.  The amendment adding the section 246 charge was made on October 5, 2010, over three years after the crime.

However, section 803 tolled the statute of limitations on the section 246 count.  Section 803, subdivision (b) provides:  "No time during which prosecution of the same person for the same conduct is pending in a court of this state is a part of a limitation of time prescribed in this chapter."  As relevant here, a felony prosecution is commenced for purposes of section 803 when an information is filed.  (§ 804, subd. (a); *People v. Ortega* (2013) 218 Cal.App.4th 1418, 1428; *People v. Johnson*, *supra*, 145 Cal.App.4th at p. 901.)  The murder charge and the section 246 charge are based on identical conduct:  Iraheta's shooting of Orozco.  Thus, the filing of the original information, which occurred within three years of the crime, tolled the statute of limitations on the section 246 count.

*People v. Whitfield* (1993) 19 Cal.App.4th 1652, is instructive.  There, the court held "the filing of an information tolls the period of limitations as to lesser related offenses which are based on the 'same conduct' (Pen. Code, § 803, subd. (b)) as that which underlies the charged offense."  (*Id.* at p. 1654.)  The

*Whitfield* defendant committed multiple sexual offenses against two victims and was charged with rape. He contended that the victims were both prostitutes and he had engaged in consensual sexual encounters with them. He therefore requested that the trial court instruct on the lesser related, misdemeanor offense of engaging in prostitution. (*Id.* at p. 1656.) A trial court is under no duty to instruct on a lesser included offense that is time-barred, since the defendant cannot be convicted of it. (*Id.* at p. 1658.) The trial court, believing the one-year statute of limitations had run on the misdemeanor offenses, refused to so instruct. (*Id.* at pp. 1656, 1658.) *Whitfield* reasoned: "The information . . . tolled the statute of limitations not only as to the charged rapes but also as to offenses based on 'the same conduct' as the charged rapes (Pen. Code, § 803, subd. (b)). The issue thus narrows to whether the related offense of prostitution is based on the 'same conduct' as the charged rapes." (*Id.* at p. 1659.) After examining the Law Revision Commission's comment to section 803, the court concluded: "where an action is dismissed and refiled after the period of limitations, the prosecutor may charge offenses based on the 'same conduct' as the dismissed action because the filing of the original action tolls the statute of limitations not only as to those offenses charged in the original action, but also as to offenses based on the 'same conduct.' " (*People v. Whitfield, supra*, at p. 1659; see also *People v. Chardon* (1999) 77 Cal.App.4th 205, 214-215; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1064 [forgery and false filings were aspects of the same rent skimming scheme; therefore, both arose from the same conduct and the statutes of limitations were tolled].) Likewise, here, the filing of the murder charge in 2003 tolled the statute of limitations.

Iraheta attempts to overcome application of section 803 by arguing that it applies only when a complaint is dismissed and refiled, not when a complaint is amended.[14] In his view, when a complaint is amended, section 1009 applies. That section provides that an information may be amended for a defect or insufficiency at any stage of the proceedings, but cannot be amended so as to charge an offense not shown by the evidence taken at the preliminary examination. Section 1009 thus " 'authorizes amendment of an information at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination.' " (*People v. Hamernik* (2016) 1 Cal.App.5th 412, 424; *People v. Ochoa* (2016) 2 Cal.App.5th 1227, 1232.)

Citing *Harris v. Superior Court* (1988) 201 Cal.App.3d 624 (*Harris*), *People v. Chapman* (1975) 47 Cal.App.3d 597, and *People v. McKay* (1979) 97 Cal.App.3d Supp. 59, Iraheta argues

---

[14] Iraheta also attempts to distinguish *Whitfield* by arguing that unlike the *Whitfield* defendant, he never requested a lesser related offense instruction; and *People v. Geiger* (1984) 35 Cal.3d 510, cited in *Whitfield*, was later overruled by *People v. Birks* (1998) 19 Cal.4th 108, 112. But these points are not germane to *Whitfield's* analysis of the section 803 issue. In resolving whether the trial court committed instructional error, *Whitfield* addressed a two-pronged inquiry: first, whether prostitution was an offense closely related to rape, such that it was a lesser related offense; and, if so, whether the statute of limitations on prostitution had run. (*People v. Whitfield, supra*, 19 Cal.App.4th at pp. 1656-1658.) The court's reference to *Geiger* pertained not to the statute of limitations issue, but to the question of whether prostitution was a lesser related offense.

that after the statute of limitations has run an information may not be amended to add a charge which is not a necessarily included offense, even though it relates to the same conduct as that originally charged. Because shooting at an occupied motor vehicle is not a lesser included offense of murder, he insists, amendment was improper. But we perceive no conflict between section 1009 and section 803, subdivision (b). Section 1009 generally governs amendment of pleadings; section 803, subdivision (b) simply provides that the statute of limitations is tolled under limited circumstances. The distinction Iraheta posits between an amended and a refiled complaint or information is nowhere apparent in the statutory language. Section 803, subdivision (b) does not state or imply that it applies only to cases in which a complaint has been dismissed and refiled.

The authorities Iraheta cites in support of his argument do not assist him. Section 803, subdivision (b), was added in 1984. (Stats. 1984, ch. 1270, § 2, p. 4335; *People v. Whitfield, supra*, 19 Cal.App.4th at p. 1660.) *Chapman* and *McKay* were decided in 1975 and 1979, respectively, and therefore say nothing about application of section 803. Nor does *Harris*, decided in 1988, assist Iraheta. In *Harris*, the defendant was charged with the January 1981 murder of the victim. The information alleged the special circumstances that the murder occurred during the commission of a robbery in violation of section 211 and a kidnapping in violation of sections 207 and 209, but did not charge the substantive offenses of robbery or kidnapping. The jury found the defendant guilty and the special circumstances true, but the judgment was reversed on appeal. The defendant moved to strike the special circumstance allegations on the

50

ground the statute of limitations had run on the underlying felonies. The trial court denied the motion and instead allowed the People to amend to allege the robbery and kidnapping as substantive offenses. (*Harris*, *supra*, 201 Cal.App.3d at p. 627.)

On appeal, *Harris* concluded amendment of the information to add the substantive offenses was improper. The court explained: "Section 1009 provides that the district attorney can amend the charges originally filed at any time, including 'on remand after reversal.' [Citation.] However, when amending an information, a critical inquiry must be made: is the amendment to correct a defect or insufficiency in the original complaint or is the amendment to charge an offense not attempted to be charged by the original complaint? 'If the amendment falls in the former category, it relates back to the date of the original filing of the information and has the effect of tolling the running of the statute of limitations from the date of the filing of the original information. [Citation.] If the amendment falls in the latter category, the . . . statute of limitations on the charges has run' [citation] and the charges are barred. Consequently, case law has held that after the statute of limitations has run, an information may not be amended to insert a charge which is not a necessarily included offense, even though it relates to the same conduct as was originally charged. [Citations.]" (*Harris*, *supra*, 201 Cal.App.3d at pp. 627-628, fn. omitted.) Although "possibly related to the same conduct as was originally charged," the robbery and kidnapping were not lesser included offenses of murder, and the amendment was improper. (*Id.* at p. 628.) Conversely, the court concluded section 803 served to toll the special circumstance allegations, which had originally been timely filed. (*Harris*, *supra*, at pp. 629-630 & fn. 3.)

51

*Harris* did not discuss application of section 803, subdivision (b) in regard to the proposed amendment adding the substantive robbery and kidnapping offenses, nor did it explain why section 803, subdivision (b) was inapplicable to that question. But an answer readily suggests itself. Section 803, subdivision (b) tolls the statute only when a prosecution for "the same conduct" is already pending. The original complaint in *Harris* charged murder; the People sought to add charges of kidnapping and robbery, which would appear to constitute different conduct within the meaning of section 803. Indeed, *Harris* described the kidnaping and robbery as "*possibly related* to the same conduct as was originally charged." (*Harris*, *supra*, 201 Cal.App.3d at p. 628, italics added.) The court's failure to consider section 803 in regard to the proposed amendment was presumably due to its view that the robbery and the kidnapping were not the same conduct as the murder.[15]

Iraheta further insists that the legislative history of section 803 demonstrates it applies only to charges that are dismissed and refiled, not to amendments to a complaint. Our fundamental task when construing a statute is to ascertain the intent of the lawmakers so as to effectuate the law's purpose. (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837.) We begin " ' "with the plain language of the statute, affording the words of the provision their ordinary

---

[15]    But see *People v. Greenberger* (1997) 58 Cal.App.4th 298, 369 [rejecting argument that kidnapping and murder in that case were not the same conduct].) We express no opinion on whether crimes carried out in conjunction with or to facilitate a murder constitute the same conduct for purposes of section 803.

52

and usual meaning and viewing them in their statutory context." ' " (*Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1384.)  Where there is no ambiguity, the plain meaning of the language controls; resort to extrinsic sources is unnecessary.  (*Id.* at p. 1385; *Ennabe v. Manosa* (2014) 58 Cal.4th 697, 713; *People v. Albillar* (2010) 51 Cal.4th 47, 55.)

Here, we need look no further than the unambiguous words of the statute.  Section 803, subdivision (b) does not distinguish between an information that is dismissed and refiled and one that is simply amended.  As the statutory language is free from ambiguity, resort to extrinsic sources is unwarranted.

Even if an examination of section 803's legislative history was appropriate, the materials Iraheta cites – the California Law Revision Commission's analysis, and *People v. Terry* (2005) 127 Cal.App.4th 750 – do not convince us section 803 is inapplicable to amendments.  Former section 802.5, the predecessor to section 803, provided in pertinent part:  "no time during which a criminal action is pending is a part of any limitation of the time for recommencing that criminal action in the event of a prior dismissal of that action . . . ."  (Stats. 1981, ch. 1017, § 3, pp. 3927-3928.)  Section 803 continues the substance of former section 802.5.  (*People v. Whitfield, supra*, 19 Cal.App.4th at p. 1659, fn. 8; *People v. Terry, supra*, at p. 768.)  But nothing in the Law Revision Commission's comments suggests the distinction between amendment and refiling that Iraheta posits; the relevant comments show an intent to broaden the law to include the same conduct, rather than limiting the tolling provision to the same action.[16]  It is true that former

---

[16]     *People v. Terry* set forth the relevant portions of the Law

section 802.5 pertained to "recommencing that criminal action in the event of a prior dismissal of that action." However, this language was jettisoned in favor of the current language of section 803, which is not limited to prior dismissals.

### 3. *Iraheta's other claims of error*

In light of our conclusion that the matter must be reversed, we do not reach Iraheta's additional contentions that the trial court committed various instructional and evidentiary errors, the prosecutor committed *Doyle* error,[17] and that the imposition of additional restitution fines and victim restitution violated double jeopardy principles.

---

Revision Commission's comments: " 'The limitation of former Section 802.5 that permitted recommencing the same "criminal action" is replaced by a broader standard of prosecution for the "same conduct," drawn from Model Penal Code § 1.06(6)(b). The former law that provided tolling only for a subsequent prosecution for the same offense was too narrow, since the dismissal may have been based upon a substantial variation between the previous allegations and the proof. The test of the "same conduct," involving as it does some flexibility of definition, states a principle that should meet the reasonable needs of prosecution, while affording the defendant fair protection against an enlargement of the charges after running of the statute.' " (*People v. Terry*, *supra*, 127 Cal.App.4th at p. 768, quoting Cal. Law Revision Com. com., 50 West's Ann. Pen. Code (1985 ed.) foll. § 803, p. 203.)

[17] *Doyle v. Ohio* (1976) 426 U.S. 610.

DISPOSITION

The judgment is reversed.

**CERTIFIED FOR PARTIAL PUBLICATION**


                                        ALDRICH, J.*


We concur:



        EDMON, P. J.



        LAVIN, J.


_____

\*      Retired Associate Justice of the Court of Appeal, Second
Appellate District, assigned by the Chief Justice pursuant to
article VI, section 6 of the California Constitution.