Filed 3/18/25  P. v. Rojas CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B336736 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA110065) |
| v. | |
| JAMES ANTHONY ROJAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

James Rojas was tried for attempted murder and for shooting at an occupied vehicle. A jury acquitted him of shooting at an occupied vehicle but deadlocked on attempted murder counts. Rojas then pled no contest to attempted murder and admitted a principal gun use allegation. Years later, he petitioned for resentencing under Penal Code section 1172.6,[1] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court denied the petition, finding beyond a reasonable doubt that Rojas could be convicted under current law as a direct aider and abettor to attempted murder.

On appeal, Rojas contends, under the doctrine of issue preclusion, that his acquittal of shooting at an occupied vehicle precluded the trial court from finding him guilty of attempted murder as an aider and abettor. Rojas also makes the alternative contentions that there was insufficient evidence he aided and abetted attempted murder and that the trial court improperly imputed malice to him. We reject these contentions.

## BACKGROUND

I. Evidence from the underlying criminal trial

Rojas and Nicholas Munoz were jointly tried on two counts of attempted murder and one count of shooting at an occupied vehicle, and Rojas was alone charged with gross vehicular manslaughter. Based on our review of the trial transcripts, we

---

[1] All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

2

find the opinion affirming in part Munoz's judgment of conviction on direct appeal (*People v. Munoz* (Sept. 6, 2019, B283921) [par. pub. opn.]) to be an accurate summary of evidence admitted at Munoz's and Rojas's trial.  We therefore quote its recitation of the background.  (See generally § 1172.6, subd. (d)(3) [at evidentiary hearing, court may consider procedural history recited in prior appellate opinion]; *People v. Lewis* (2021) 11 Cal.5th 952, 972 [appellate opinion generally part of record of conviction in § 1172.6 proceedings].)  We have taken judicial notice of the clerk's and reporter's transcripts from that case. (Evid. Code, § 452, subd. (d).)

"1.  *Facts*

"Munoz was a member of the Pico Viejo criminal street gang.  His cousins, codefendant James Rojas, and Rojas's brother, Jonathan Loaiza, were also Pico Viejo members.  Victor Espindola, David Carrillo, and Adrian Perez were all members of the Brown Authority criminal street gang.  The Pico Viejo and Brown Authority gangs were bitter enemies.  Their claimed territories overlapped, leading to ongoing violence and numerous shootings between the gangs.  Both gangs claimed Streamland Park in Pico Rivera as their territory.

"a.  *People's evidence*

"(i)  *The shooting*

"On June 26, 2015, between 7:00 and 8:00 p.m., Espindola, Carrillo, and Perez, along with a woman named Daisy, went to Streamland Park in Espindola's mother's burgundy Yukon SUV. At the park, Carrillo spoke to some men near the baseball diamond.  Espindola's group then saw a person with whom they

3

did not 'get along.' Carrillo or Perez confronted the man, who ran up a nearby hill.

"Espindola then drove the group away from the park in the SUV. Carrillo and Perez sat in the back seat, with Carrillo on the driver's side. Daisy was in the front passenger seat. Espindola drove northbound onto Rosemead Boulevard, in the far right lane, at 10 to 15 miles per hour, looking for the man who had run up the hill. According to Espindola, his group did not intend to scare the man, but simply wished to determine why he ran from them.

"Meanwhile, Rojas was driving his girlfriend's blue Mitsubishi Galant on Rosemead Boulevard, with passengers Munoz and Loaiza. When Espindola's SUV was parallel with the park at the top of the hill, Rojas drove up to the SUV on the driver's side and Munoz and Loaiza fired shots directly at the SUV. Espindola heard six gunshots. He heard his window 'pop' and a gunshot hit the car door, and then Rojas's Mitsubishi sped off. Espindola briefly continued driving on Rosemead until Carrillo said he had been hit, and lost consciousness. Espindola made a U-turn and drove Carrillo to the hospital. According to Espindola, he was surprised by the shooting and did not know why the assailants shot at his SUV. No one in Espindola's group was armed, and they did not display guns or shoot at anyone. The whole incident transpired very quickly.[2]

---

[2] Espindola described the incident to detectives in a July 29, 2015 recorded interview that was played for the jury, and again in a second, unrecorded interview with a detective shortly before trial. At trial, Espindola denied being a gang member, denied making most of the statements in the interviews, professed not to remember most of the evening's events, and at times refused to

4

"Carrillo was shot in the stomach and underwent surgery at the hospital.

"(ii) *The accident*

"Rojas drove from the shooting scene and attempted to enter the 60 Freeway at an excessive speed, causing the Mitsubishi to crash. Motorist Cynthia Arredondo observed the Mitsubishi tumble down an embankment by the Rosemead onramp, landing on its roof. Arredondo pulled over and called 911, while her boyfriend attempted to render aid. Munoz was partially pinned inside the car and was calling for help; he eventually managed to free himself. Loaiza, who had been seated in the front passenger seat, was deceased. Rojas was outside the car, talking on a cellular telephone. When Arredondo asked Rojas whether everyone was okay, he responded, ' "I killed my brother." ' He also said someone had been chasing them. Within three minutes, before emergency personnel or deputies arrived, a car picked Rojas up from the accident scene.

"(iii) *The investigation*

"Two firearms were found outside the Mitsubishi at the accident scene: a nine-millimeter Sig Sauer with an empty magazine, and a .380-caliber Lorcin semiautomatic pistol, loaded with a bullet in the chamber and a magazine containing five live cartridges. At the shooting scene, which was approximately a half mile from the accident scene, deputies recovered a bullet fragment, four fired nine-millimeter cartridge cases, and one fired .380-caliber cartridge case. Espindola's SUV bore five bullet

---

answer questions. He did, however, confirm that no one in his group was armed or shot at Rojas's car.

5

holes, and five bullet fragments were recovered from the area between the vehicle's exterior and the interior panel. Forensic examination revealed that the .380-caliber cartridge case had been fired from the .380-caliber Lorcin gun found at the accident scene. Munoz's DNA matched DNA found on the .380-caliber Lorcin gun. The four expended nine-millimeter cartridge cases and four of the bullet fragments had been fired from the Sig Sauer gun.[3] Two of the bullet holes in the SUV were made by nine-millimeter bullets. A Pittsburgh Pirates baseball cap that had been ejected from the Mitsubishi was on the ground at the accident scene.

"Rojas's Mitsubishi bore no evidence of bullet strikes, and no evidence suggested the occupants of the SUV shot at the Mitsubishi.

"(iv) *Munoz's jail conversation with a confidential informant*

"On June 29, 2015, Munoz was placed in a jail cell with a confidential informant. Their conversation was recorded and played for the jury. Munoz stated he was a Pico Viejo gang member with the moniker 'Lil Scrappy.' He described the incident as follows.[4] Some 'fools,' whom he believed to be Brown Authority gang members, had been chasing and attempting to shoot at or harm his cousin and fellow gang member, Loaiza. Loaiza was an 'ace' and a 'straight rider,' that is, an active gang

---

"[3]     The fifth bullet fragment was too small to allow for a conclusive comparison.

"[4]     Munoz described the incident using street slang, which was in some instances interpreted by the gang expert.

6

member known for committing crimes for the gang. Munoz and Loaiza shot at the Brown Authority gang members, with Munoz firing a .380 and Loaiza firing a nine-millimeter firearm. Munoz's gun jammed after he fired one shot. Loaiza, however 'fucken served them, boom, boom, boom, boom, boom.'[5] Although it was dark, Munoz 'just knew it was them, though . . . I just knew it.' When Munoz's group fled, the other car chased them. Munoz thought the Brown Authority gang members had guns and tried to pull them. When the accident occurred, he and Loaiza were not wearing seat belts. Munoz was injured, Loaiza died, and Rojas fled.

"(v)  *Gang expert's testimony*

"Los Angeles County Sheriff's Detective Stephen Valenzuela testified as the prosecution's gang expert, regarding the Pico Viejo gang's membership, origins, territory, primary activities, symbols, 'code of silence,' and predicate offenses.[6] Pico Viejo was one of the most violent gangs in the Pico Rivera area. There had been numerous shootings between the Pico Viejo and Brown Authority gangs, and incidents of violence in Streamland Park. In Valenzuela's opinion, Munoz, Loaiza, and Rojas were

---

"[5]    According to the gang expert, 'served,' in this context, means shot at.

"[6]    Because Munoz does not challenge Detective Valenzuela's qualifications as an expert, or the sufficiency of the evidence to support the gang enhancement, we do not detail that evidence here.

Pico Viejo gang members.[7]  The gang used the Pittsburgh Pirates 'P' as one of its symbols, and the Pittsburgh Pirates baseball cap found at the accident scene was commonly worn by Pico Viejo gang members.  Valenzuela opined that Espindola and Carrillo were members of the Brown Authority gang.

"When given a hypothetical based on the evidence adduced at trial, Valenzuela opined that the shooting was committed for the benefit of, and in association with, the Pico Viejo gang.  The shooting benefitted the gang by showing the community and other gangs that Pico Viejo gang members would 'do anything to protect their borders.'  Moreover, the gang members were acting together, looking for rivals.  Such conduct would instill fear in the community and in gang rivals, thereby making them afraid to report crimes to police, 'further[ing] the stranglehold that gangs and gang violence have in the community.'

---

"[7]     Munoz had Pico Viejo-related tattoos, and had admitted his gang membership to the confidential informant, and to a detective; Valenzuela was also aware of Munoz's membership by virtue of his own investigation into violent crimes committed by the gang.  Rojas and Loaiza also had Pico Viejo-related tattoos. Photographs showed Munoz, with Loaiza, Rojas, and others, making Pico Viejo gang signs.

"b. *Defense evidence*

"(i) *Testimony from witnesses at Streamland Park*

"Robert Mendoza and Savaltore Dominic Mendoza[8] were both at Streamland Park on the evening of June 26, 2015,[9] preparing the baseball fields for a tournament the next morning. Mariah Ginez and her boyfriend were also at the park at that time. Robert saw a male Hispanic walking around the park, apparently looking for something. Shortly thereafter, a maroon SUV pulled into the parking lot. Two Hispanic men exited the SUV and began 'hanging out' with the first man at the baseball diamond's backstop. One of the men asked Robert whether there were any games that night, whether Robert knew a former Little League president, and whether anyone from Pico Viejo was at the park. Robert said only the Little League coaches were present. The men returned to the SUV. Shortly thereafter, one of the men returned to the field with a baseball bat and yelled, ' "Are you guys from Pico Viejo?" ' Robert and Savaltore ignored them and moved to another area of the field. Savaltore phoned his wife and asked her to call 911. The SUV picked up the man with the bat, and 'peeled out' of the parking lot.

"Ginez observed a man at the top of a small hill on the back side of the park. The driver of the SUV yelled at the man on the

[8]    For ease of reference, and with no disrespect, we hereinafter refer to Robert Mendoza and Savaltore Mendoza by their first names.

[9]    Although the witnesses did not testify to the precise date in June, there is no dispute that their testimony related to June 26, 2015, the date of the shooting.

9

hill, 'this is my barrio,' or similar words.  The men seemed to be arguing, and the man from the SUV said, 'let's go one-on-one.'  However, the man from the SUV did not attempt to run up the hill after the other individual.

"According to Robert and Savaltore, other than the baseball bat, the men from the SUV did not have any visible weapons, nor, according to Ginez, did the man who yelled at the person on the small hill.

"Within five to 10 minutes, Robert, Savaltore, and Ginez heard gunshots nearby.

"(ii)  *Rojas's testimony*

"Rojas testified in his own defense.  His family had longstanding ties to the Pico Viejo gang.  In June 2015 he and his family were living in Bell Gardens.  On the night of the shooting, Loaiza called Rojas and said he was at Streamland Park to meet a girl, but did not feel safe and thought it might be a set up.  Rojas drove to the park and located Loaiza, who was with Munoz.  Rojas picked both men up and began driving home.  When he made a right turn onto Rosemead, he saw a burgundy SUV on the shoulder.  Loaiza said, ' "Those are those fools right there." '  As Rojas neared the SUV, he saw the SUV's windows rolling down.  Rojas 'hit the gas.'  Almost immediately, Rojas heard gunshots and ducked.  He could not tell whether the shots came from inside or outside of his vehicle.  He continued down Rosemead Boulevard and saw, in his rearview mirror, that the other car was behind him, driving fast.  Rojas sped up and lost control of his car, which plunged down an embankment, flipping several times.  He had not been looking for anyone when he pulled onto Rosemead Boulevard; he had been planning to drive home.  When Arredondo approached to help, he told her to leave

because 'we just got chased.' He fled the scene because he was scared. He had gone to the park to protect his little brother; he had not come prepared for violence; he had not known, and had no reason to believe, that Loaiza had a weapon or that there were guns in the car. He denied being an active gang member, but admitted a prior association with the Pico Viejo gang." (*People v. Munoz*, *supra*, B283921.)

II.    Jury instructions, verdict, and sentence

The prosecutor's theory at Rojas's and Munoz's joint trial was that Munoz personally shot at the victims, and Rojas aided and abetted the crimes. The trial court accordingly instructed the jury on aiding and abetting and on attempted murder under the natural and probable consequences doctrine, with shooting at an occupied vehicle being the target offense.[10] The jury acquitted

---

[10]    The jury was instructed that the "defendants are charged in Count 3 with shooting at an occupied motor vehicle in violation of … section 246 and in Counts 1 and 2 with attempted murder. [¶] You must decide whether the defendant is guilty of shooting at an occupied vehicle. If you find the defendant is guilty of this crime, you must then decide whether he is guilty of attempted murder. [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that the defendant is guilty of attempted murder under the doctrine of natural and probable consequences, the People must prove that: [¶] 1. The defendant is guilty of shooting at an occupied vehicle; [¶] 2. During the commission of shooting at an occupied vehicle, a coparticipant in that shooting at an occupied vehicle committed the crime of attempted murder; [¶] . . . [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder was

Rojas of count 3 for shooting at an occupied vehicle and deadlocked as to remaining counts for attempted murder and gross vehicular manslaughter. The trial court declared a mistrial as to the counts the jury deadlocked on.

Thereafter, Rojas pled no contest to one count of attempted murder, admitted a principal gun use allegation (§ 12022.53, subds. (b) & (e)(1), and admitted a gang allegation (§ 186.22, subd. (b)(1)(C)). On August 3, 2018, a court sentenced Rojas to a total term of 19 years in prison.[11]

III.    Postconviction petition for resentencing

In 2022, Rojas petitioned for resentencing under section 1172.6. The trial court appointed counsel for Rojas, received briefing, and set the matter for an evidentiary hearing. In his brief, Rojas argued that his acquittal on the shooting at an occupied vehicle count precluded him from being convicted of attempted murder as an aider and abettor under the doctrine of issue preclusion. Moreover, redesignating the offense to an

_____

a natural and probable consequence of the commission of the shooting at an occupied vehicle."

[11]    The jury convicted Munoz of the willful, deliberate, and premediated attempted murders of Carrillo and Espindola (§§ 664, subd. (a), 187, subd. (a); counts 1 & 2) and of shooting at an occupied vehicle (§ 246; count 3). As to all counts, the jury found true personal gun use allegations under section 12022.53, subdivisions (b) and (c), and principal gun use allegations under subdivisions (b), (c), (d), and (e)(1). The jury also found true gang allegations as to all counts (§ 186, subd. (b)(1)(C)). The jury found not true the allegation that Munoz fired a gun causing great bodily injury.

assault with a firearm was similarly precluded, so Rojas could not be convicted of any crime and the judgment had to be vacated.

At the evidentiary hearing, the parties did not introduce new or additional evidence, and the trial court relied on transcripts from the joint trial.[12] The trial court rejected Rojas's argument that the acquittal on the shooting at an occupied vehicle count precluded it from considering any evidence that he aided and abetted a shooting at the evidentiary hearing. The trial court then summarized the evidence at length and framed the issue as whether Rojas, "the driver of the suspect vehicle, had the requisite intent to aid and abet and facilitate the attempted murder that occurred at the shooting scene? That's the issue. That's the theory of liability that I can only see here that the People can rely upon is direct aider and abettor liability for an attempted murder."

In ruling, the trial court found significant that Rojas and his companions were unlikely to have armed themselves if they were just meeting a girl at the park, unless they assumed they would be encroaching on rival territory. To the trial court, this begged the question of where the guns came from: "If they were not armed to begin with, they had to appear somewhere else or in

_____

[12] Defense counsel objected that some evidence, for example, Munoz's jailhouse statements, was inadmissible at the evidentiary hearing. The trial court overruled the objections. Although Rojas alludes to the objections on appeal, we do not consider them because Rojas fails to make any direct argument about them. (See *Bains v. Moore* (2009) 172 Cal.App.4th 445, 455 [appellate review is limited to issues adequately raised and briefed].)

13

some other means. The only other means is being transported by Mr. Rojas when he received the call 'We need help.' And this is right after a verbal confrontation occurred that was in a gang-related way." Therefore, this was not a "rash or impulsive act of shooting. … They were on a hunt that night with Mr. Rojas at the helm." Rojas picked up Munoz and Loaiza, "positioned his vehicle," and made weapons available to the two shooters, who used them. The trial court concluded that it did not matter who fired the guns, what "matters is did Mr. Rojas help facilitate the shooters in committing that act, not just to injure or frighten Mr. Carrillo away or any of the occupants but to actually kill? And given the number of rounds that were fired using not just one weapon but two weapons at close range, that clearly establishes requisite intent to kill. … So all of it falls into place which this court finds beyond a reasonable doubt that the plea stands based on the current changes in the law for direct aider and abettor liability." Accordingly, the trial court denied Rojas's petition.

## DISCUSSION

### I. Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis, supra,* 11 Cal.5th at pp. 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843

14

(*Gentile*).) As amended by Senate Bill No. 775, effective January 1, 2022, these ameliorative changes to the law now expressly apply to attempted murder under the natural and probable consequences doctrine.

As relevant here, Senate Bill 1437 added section 188, subdivision (a)(3), which states that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be imputed to a person based solely on his or her participation in a crime." Under section 188, subdivision (a)(3), an accomplice no longer may be guilty of murder based on the mere determination the accomplice aided and abetted a target crime, and murder or attempted murder was a natural and probable consequence of that target crime. (See generally *People v. Reyes*, *supra*, 15 Cal.5th at p. 984.) However, Senate Bill 1437 did not eliminate direct aiding and abetting liability for murder and attempted murder. (*Gentile*, *supra*, 10 Cal.5th at p. 848; *People v. Cortes* (2022) 75 Cal.App.5th 198, 204–205 [petitioner convicted of murder and attempted murder either as perpetrator or direct aider and abettor ineligible for § 1172.6 relief].)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder or attempted murder under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, *supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder or attempted murder under the current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

II.     Standard of review

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.)  Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.)  We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)  We do not resolve credibility issues or evidentiary conflicts. (*Ibid*.)  Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

16

Notwithstanding this standard of review, Rojas appears to suggest that where the appeal is on a "cold record" we need not defer to the trial court's findings but may make our own. He cites *People v. Vivar* (2021) 11 Cal.5th 510. *Vivar* concerned section 1437.7, under which courts may vacate a conviction if a defendant shows a prejudicial error affecting the defendant's ability to meaningfully understand the immigration consequences of a plea. *Vivar*, at page 524, emphasized that while the inquiry whether counsel's immigration advice was inadequate and prejudicial involved mixed questions, the inquiry was predominately one of law. As such, independent review on appeal was proper. The court further noted that its decision applied only to section 1437.7, and nothing it said otherwise "disturbs a familiar postulate" requiring appellate deference to the trial court's factual findings regardless of whether they are based on oral testimony or declarations. (*Vivar*, at p. 528, fn. 7.) We therefore find Rojas's reliance on *Vivar* unpersuasive to show that the substantial evidence standard of review is inapplicable. (See, e.g., *People v. Clements*, *supra*, 75 Cal.App.5th at pp. 301–302 [substantial evidence review applies even where review of § 1172.6 evidentiary hearing is from a "cold record" and distinguishing *Vivar*]; accord, *People v. Njoku* (2023) 95 Cal.App.5th 27, 42–43.)

III.    Issue preclusion

The prosecutor's theory of the case was Rojas aided and abetted the charged crimes and was not a shooter or actual killer. Rojas's jury acquitted him of shooting at an occupied vehicle, deadlocked on the attempted murder counts, and Rojas subsequently pled no contest to one count of attempted murder. Rojas now contends that his acquittal on the count for shooting at

17

an occupied vehicle precluded the trial court at the section 1172.6 evidentiary hearing from finding he could be convicted of attempted murder.  Specifically, Rojas posits that the jury's finding that he did not aid and abet the shooting at an occupied vehicle precluded the trial court from finding he aided and abetted the attempted murder by helping his accomplices shoot at the victim's vehicle.  We disagree.

Issue preclusion bars relitigating previously decided issues. (*People v. Arnold* (2023) 93 Cal.App.5th 376, 386–387 (*Arnold*).) It applies (1) after final adjudication (2) of an identical issue (3) that was actually litigated and decided in a former proceeding, and (4) can only be asserted against a party to the former proceeding.  (*Id.* at p. 386, citing *Strong*, *supra*, 13 Cal.5th at p. 716.)  The identical issue requirement "addresses whether 'identical factual allegations' are at stake in the two proceedings." *(Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342.)  " '[I]n determining whether the identity [of issues] requirement is satisfied, courts must be mindful of the need to distinguish "issues" from "legal theories." ' "  (*Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1327; *Wimsatt v. Beverly Hills Weight etc. Internat., Inc.* (1995) 32 Cal.App.4th 1511, 1517.)

The doctrine of issue preclusion applies at section 1172.6 proceedings.  (See generally *Strong*, *supra*, 13 Cal.5th at p. 715 [issue preclusion generally will govern whether prior finding will be given preclusive effect in later proceeding]; *People v. Curiel* (2023) 15 Cal.5th 433, 453 [noting its prior observation in *Strong* that "a relevant jury finding is generally preclusive in" § 1172.6

proceedings]; *Arnold*, *supra*, 93 Cal.App.5th 376; *People v. Cooper* (2022) 77 Cal.App.5th 393, 397 (*Cooper*).)[13]

In *Cooper*, *supra*, 77 Cal.App.5th at page 397, for example, a jury convicted the defendant of murder and kidnapping, found true a principal gun use allegation, and acquitted him of being a felon in possession of a firearm. At a subsequent section 1172.6, subdivision (d)(3), hearing, the trial court denied relief, finding that Cooper was a major participant who acted with reckless indifference to human life because he fired a gun. The appellate court reversed the trial court's order, concluding that "a trial court cannot deny relief in a section [1172.6] proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Ibid.*; accord, *People v. Henley*, *supra*, 85 Cal.App.5th 1003.) The court noted that Cooper had stipulated at trial he was a felon. (*Cooper*, at p. 398.) Accordingly, when the jury acquitted Cooper of being a felon in possession of a gun, they found he did not possess a gun. The trial court at the section 1172.6 hearing therefore could not base his ineligibility for relief on him possessing or using a gun.

Similarly, in *Arnold*, *supra*, 93 Cal.App.5th at page 379, a jury found the defendant guilty of murder in the stabbing death of a man during a brawl. But the jury found not true an

---

[13] New or additional evidence was not introduced at Rojas's evidentiary hearing. The preclusive effect of a jury finding at an evidentiary hearing at which new or additional evidence is introduced therefore is not before us. (See, e.g., *People v. Henley* (2022) 85 Cal.App.5th 1003 [addressing preclusive effect of jury finding at later § 1172.6 evidentiary hearing where defendant testified].)

allegation that the defendant personally used a knife. (*Ibid.*)
Defendant petitioned for section 1172.6 relief. After an
evidentiary hearing at which no new or additional evidence was
introduced, the trial court denied relief, finding Arnold to be the
actual killer, that is, he stabbed the victim. The appellate court
concluded that the trial court was precluded from so finding.
(*Arnold*, at pp. 386–387.) Specifically, the jury was instructed
that, to find the personal use of a knife allegation true, it had to
determine whether the defendant displayed the knife in an
intentionally menacing manner or intentionally struck a person
with it. (*Id.* at p. 386.) The jury "necessarily decided the issue in
rendering its not true finding on the knife use allegation." (*Id.* at
p. 387.)

Rojas urges that *Cooper* and *Arnold* compel a conclusion he
cannot be convicted of aiding and abetting an attempted murder
because the same acts he engaged in to aid the shooting are the
same acts he engaged in to aid the attempted murder. However,
the *Cooper* and *Arnold* juries resolved a discrete issue of ultimate
fact: whether the defendants used or had a weapon. Thus, the
*Cooper* jury's acquittal amounted to a finding that Cooper did not
possess a gun.[14] The *Arnold* jury's finding that Arnold did not
display the knife in an intentionally menacing manner or
intentionally strike a person with it precluded the court at the
section 1172.6 hearing from finding that Arnold stabbed the
victim.

---

[14]    As we noted, Cooper stipulated at trial that he was a
convicted felon, and therefore the only issue before the jury in
deciding whether he was a felon in possession of a gun was
whether he possessed a gun.

20

Unlike those cases, Rojas's acquittal of shooting at an occupied vehicle did not necessarily decide an issue of ultimate fact that precluded his guilt for aiding and abetting attempted murder, which requires a specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing (*People v. Lee* (2003) 31 Cal.4th 613, 623). Rojas's jury instead decided a legal theory, whether Rojas aided and abetted shooting at an occupied vehicle. Multiple elements or issues comprised that theory; namely, (1) the defendant willfully and maliciously shot a firearm, (2) the defendant shot the firearm at an occupied vehicle, and (3) the defendant did not act in self-defense or defense of another. (CALCRIM No. 965.) Someone "commits an act willfully when he or she does it willingly or on purpose" and "acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else." (CALCRIM No. 965.) Rojas was guilty of aiding and abetting shooting at an occupied vehicle if: "1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.)

We do not know how the jury necessarily resolved the multiple elements regarding how Rojas aided and abetted the two potential shooters, Loaiza and Munoz. Jurors may not have been able to agree on Rojas's mens rea as to each shooter. For example, there was evidence that Loaiza told his brother that he (Loaiza) was being set up. Did jurors therefore believe that Loaiza needed to defend himself? Moreover, did jurors believe

21

that Rojas thought his brother was in danger and had to defend his brother or himself?  Similarly, the jury's conviction of Munoz for shooting at an occupied vehicle does not resolve whether the jury believed that Rojas nonetheless thought Munoz was acting in self-defense or out of malice.  Therefore, while the jury resolved a legal theory in Rojas's favor, it did not necessarily resolve a discernable ultimate fact or issue in his favor that would preclude his conviction for aiding and abetting attempted murder.  (See, e.g., *Ayala v. Dawson*, *supra*, 13 Cal.App.5th at p. 1327.)

Our conclusion is not inconsistent with *People v. Santamaria* (1994) 8 Cal.4th 903 (*Santamaria*).  In that case, the victim had been stabbed, strangled, and run over by a car.  (*Id.* at p. 908.)  Santamaria and another man were involved in the victim's death, but only Santamaria was tried for special circumstance murder committed during a robbery and with personally using a knife during the crime.  (*Ibid.*)  At Santamaria's trial, his accomplice testified against him.  The jury convicted Santamaria of murder but found the knife-use allegation not true.  (*Id.* at p. 909.)  The court of appeal reversed the murder conviction based on a procedural error in allowing a continuance and remanded for a new trial.

The parties agreed that at Santamaria's retrial for murder, he could not also be retried on the knife-use allegation.  (*Santamaria*, *supra*, 8 Cal.4th at p. 910.)  However, Santamaria also urged that the jury's finding precluded retrial of the murder charge on a theory he personally used a knife.  (*Id.* at pp. 911–912.)  *Santamaria*, at page 917, noted that the jury's acquittal on the knife allegation and conviction on the murder and robbery charges involved different issues.  The verdict showed that the

22

jury had a reasonable doubt that Santamaria "specifically used a knife. *It does not show the reverse, that the jury specifically found defendant was an aider and abettor. . . .* The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played,*" which would explain the split verdict. (*Id.* at p. 919.) The jury therefore might have reasonably doubted Santamaria was the direct perpetrator and similarly doubted he was the aider and abettor, but had "no such doubt that he was one or the other." (*Ibid.*) As unanimity on the *theory* of murder is not required, the jury could properly find him guilty of murder.

The court of appeal thus concluded that the issue decided by the knife-use verdict and the one the defense wanted precluded in the murder retrial were not identical. (*Santamaria*, *supra*, 8 Cal.4th at p. 920.) "Although defendant claims he merely seeks to preclude the theory that he used the knife, he necessarily is claiming more; he seeks to preclude the theory, and evidence to support the theory, that he *either* used the knife *or* aided and abetted the one who did. This, however, is not the issue decided regarding the enhancement allegation. Whether defendant specifically used a knife is one question; we may assume the prosecution did not prove that beyond a reasonable doubt, which explains the not true enhancement verdict. Whether defendant committed murder by either using a knife or aiding and abetting the one who did is quite a different question; the prosecution *did* prove that to the jury's satisfaction." (*Ibid.*)

The Attorney General here argues that *Santamaria* governs this case and that *Arnold* and *Cooper* were wrongly decided. The Attorney General thus notes that *Santamaria* held

23

that the jury's not true finding on the knife-use allegation did not bar the prosecution from proving the defendant's guilt for murder based on a theory he committed it using a knife. It therefore appears that the Attorney General reads *Santamaria* as standing for the proposition that an acquittal merely means the jury had a reasonable doubt that the defendant committed the crime or enhancement and does not amount to any finding that must be given preclusive effect. But, as we have said, issue preclusion does apply at section 1172.6 hearings. It simply does not apply in this case because identical issues are not involved.

IV.     Sufficiency of the evidence

Rojas next contends that there was insufficient evidence he aided and abetted attempted murder. We reject this contention.

As we have said, attempted murder requires a specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing. (*People v. Lee, supra*, 31 Cal.4th at p. 623.) To establish that Rojas aided and abetted that crime, there had to be sufficient evidence he, "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Mere presence at the scene of a crime or knowledge of, but failure to prevent the crime, are not sufficient to establish aiding and abetting its commission. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) However, factors which may be considered to determine aiding and abetting include presence at the scene of the crime, companionship, and conduct before and after the offense. (*Ibid.*)

24

Here, there was evidence that Rojas, Munoz, and Loaiza belonged to the same gang. Loaiza told his brother, Rojas, that a rival gang member had threatened Loaiza while Loaiza was at Streamland Park, an area Rojas's gang claimed as its territory. As the trial court found, it was reasonable to infer that Rojas drove to the park with guns in his car because Loaiza was at the park to meet a girl, so it was unlikely Loaiza would be armed unless he expected trouble. Rojas picked his brother up, along with Munoz. Instead of leaving the park, Rojas pulled his car alongside the victims' car, enabling Loaiza and Munoz to shoot at the victims. Rojas then fled, but crashed his car, killing Loaiza. Instead of staying with his dying or dead brother, Rojas fled again, thereby evidencing consciousness of guilt. (See generally *People v. Bonilla* (2007) 41 Cal.4th 313, 328–329 [circumstances of defendant's departure from crime scene must suggest a purpose to avoid arrest or being observed].) Moreover, while gang evidence alone cannot prove a defendant is an aider and abettor to a crime (*People v. Guillen* (2014) 227 Cal.App.4th 934, 992), it is relevant to show motive for the crime, which is often probative of intent to kill (*People v. Smith* (2005) 37 Cal.4th 733, 740–741; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1252–1253; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168). The rival gang member's threat to Loaiza, who was Rojas's brother and fellow gang member, supported a finding that Rojas intended to help his brother or Munoz kill the rival gang member.

Rojas, however, takes another view of the evidence. He argues that the victims instigated the incident by confronting Loaiza. Therefore, Loaiza, Munoz, and Rojas acted in self-defense or, as Rojas testified, Rojas was ignorant that his

25

companions intended to commit an act of violence. That was one interpretation of the evidence. But another reasonable inference was that Rojas and his companions sought out the victims to retaliate violently against them. The trial court was entitled to adopt this view of events.

Rojas also suggests that Espindola and Carrillo's testimony was not credible because they were gang members with convictions for crimes of moral turpitude. However, the trial court was aware of any issues regarding their testimony and was entitled to draw its own conclusion about their credibility. In short, Rojas asks us to reweigh the evidence and reevaluate witnesses' credibility. This, we cannot do. (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

IV.     Imputed malice murder

Rojas's final contention is that the trial court imputed malice to him. We disagree.

In making this contention, Rojas relies on the following comments the trial court made at the evidentiary hearing: "But the bottom line is this court must make a finding beyond a reasonable doubt that Mr. Rojas harbored the requisite intent to kill one of the occupants, specifically Mr. Carrillo was the person who suffered the gunshot wound and was injured. Doesn't matter who fired the bullet. *What matters is did Mr. Rojas help facilitate the shooter in committing that act, not just to injure or frighten Mr. Carrillo away or any of the occupants but to actually kill?* And given the number of rounds that were fired using not just one weapon but two weapons at close range, that clearly establishes the requisite intent to kill as opposed to any other intent, be it to maim, injure, or simply frighten away. So all of it falls into place which this court finds beyond a reasonable doubt

26

that the plea stands based on the current changes in the law for direct aider and abettor liability." (Italics added.)

Rojas argues that the emphasized sentence shows that the trial court focused on his actus reus and imputed malice to him. Not so. Rojas ignores the trial court's express acknowledgement earlier in that paragraph that its duty was to find beyond a reasonable doubt that Rojas "harbored the requisite intent to kill" the victim. We have otherwise reviewed the transcript of the evidentiary hearing and have found nothing to suggest the trial court misunderstood the mens rea required for attempted murder.

Next, Rojas cites cases holding that jury instructions on aiding and abetting and second degree murder improperly permit defendants to be convicted of second degree implied malice murder by imputing malice to them and without finding they personally acted with malice. (See, e.g., *People v. Langi* (2022) 73 Cal.App.5th 972; *People v. Powell* (2021) 63 Cal.App.5th 689.) Rojas, however, was not convicted of second degree implied malice murder. He was convicted of attempted murder, which requires express malice or a specific intent to kill. (See, e.g., *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [attempted murder conviction necessarily required intent to kill finding].) As we have said, the trial court understood the elements of the crime before it, attempted murder. Further, *Langi* and *Powell* involved possible instructional error. Jury instructions, however, were not at issue at Rojas's section 1172.6 evidentiary hearing. *Langi* and *Powell* therefore are not on point.

27

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.